### PARKHURST and others *v.* HOSFORD and another.

*(Circuit Court, D. Oregon.* October 31, 1884.)

1. **VENDOR AND VENDEE—INADEQUACY OF CONSIDERATION.**
   Mere inadequacy of price is not sufficient to avoid the sale of real property; but when such inadequacy is gross, and the vendor was needy and of weak mind, and acted upon the impression that he was indebted to the vendee, when he was not, equity will give relief by treating the vendee as the trustee of the property for the benefit of the vendor or his representatives. Four hundred dollars *held* to be a grossly inadequate price for property worth not less than $1,500.

2. **INSANITY—OPINION OF NON-PROFESSIONAL WITNESS.**
   Upon the trial of an issue involving the sanity of a person, the opinion of a non-professional witness, based upon his own observations, is competent evidence, and is entitled to weight according to the intelligence of the witness, his means of information, and the character of the derangement.

3. **VENDOR AND VENDEE—NOTICE OF PRIOR EQUITY.**
   A purchaser of real property for a valuable consideration is not affected by notice of a prior adverse equity received from a stranger or person not interested in the property; nor will mere rumors or hearsay concerning such equity, and communicated by such person, be sufficient to put him on inquiry, and charge him with knowledge of the facts that he might have thereby learned.

Suit to Set Aside a Conveyance.

*Rufus Mallory* and *William M. Ramsey,* for plaintiffs.

*W. H. Holmes,* for defendant Hosford.

*E. J. Dawne,* for defendant Schindler.

DEADY, J. The plaintiff C. T. Parkhurst and 15 others, citizens of Kansas, Illinois, Massachusetts, Indiana, New York, and California, respectively, bring this suit against E. F. Hosford and John Schindler, citizens of the state of Oregon, for relief against a conveyance made by Lewis Parkhurst in his life-time to the defendant Hosford, of a tract

of land situate in Polk county, and containing 318 acres; and also a subsequent conveyance made by said Hosford of a portion of the same premises to the defendant Schindler, upon the ground of the insanity or imbecility of Parkhurst at the date of the conveyance to Hosford, and the inadequacy of the consideration therefor. The case was heard on the bill, answer, and replication thereto, and the evidence. The defendants answered separately, but not under oath. The answer of Schindler contains the defense that he was a purchaser in good faith and for a valuable consideration, and also the statute of limitations. The answers, not being under oath, are not evidence for the defendants, and the rule invoked by counsel for Hosford, that his answer must be taken for true, unless overcome by the testimony of two witnesses, or that of one witness and circumstances equivalent to another, does not apply. The answer of Hosford admits the conveyance from Parkhurst to him, and from him to Schindler, but denies the insanity of the former, and the inadequacy of the consideration, and the alleged value of the premises now and at the time of such conveyances. The evidence is voluminous and quite contradictory on the disputed points. The plaintiffs examined 32 witnesses, whose testimony covers 305 legal cap pages, while the defendants examined 37, whose testimony covers 416 such pages.

The following facts are admitted or satisfactorily proven:

Lewis Parkhurst was a native of Dana, Massachusetts, from whence he emigrated to Wisconsin in 1843, and thence to Oregon in 1848. Soon after, he occupied the premises in question, and some time in 1850 became a settler thereon, under the donation act of September 27th of that year. Having subsequently complied with the provisions of said act, the land was set off to him by the proper authority as claim No. 70, and on February 9, 1866, a patent was issued to him therefor. This donation includes parts of sections 8, 9, and 10, in township 7 S., of range 3 W., and is situate in Polk county, on the west bank of the Wallamet river, about three miles below Salem. About one-third of it is prairie, and the rest of it is covered with scattered timber and brush, and the greatest portion of it is bottom land, consisting of a dark sandy loam, and in extreme high water is subject to overflow. Parkhurst was born in 1817, and was never married. He lived alone in a cabin on his donation, and maintained himself principally by days' work in the neighborhood. The defendant Hosford and his brother, C. O. Hosford, settled on the public land adjoining Parkhurst's donation about 1849, and for some years thereafter the latter worked more or less as a sawyer in the defendants' saw-mill. Parkhurst was a Methodist, and so are the Hosfords,—C. O. Hosford being a preacher in that denomination,—and on this account, as well as their nearness of residence, Parkhurst appears to have been more intimate with them than any one else, and had great confidence in the defendant. In time he seems to have been possessed with the idea that he was Jesus Christ, the lion of Judah, and claimed the right to have carnal communication with women at his pleasure.

In 1860 he was arrested on a charge of an indecent assault upon a woman of the neighborhood, a connection of C. O. Hosford's, and was discharged on giving bond in the sum of $250 for his good behaviour. The evidence on this point is indefinite, but nothing more was done in the matter, and it is probable that the charge was not well founded, and was predicated as much on his foolish talk about women as anything else. But, however this may be, Parkhurst was by some means impressed with the idea that he was in

danger of being mobbed on that account, and left the county and went to C. O. Hosford's, who had about the same time removed to Multnomah county, and settled a short distance east of Mt. Tabor, for whom he worked on the farm about three months. Then he probably went to the east of the Cascade mountains, in the direction of the gold mines that were discovered there about this time. In the winter of 1861–62, C. O. Hosford says he roomed awhile in Portland, and that he worked for him again six weeks during the summer of 1862, and in the fall of that year he returned to his donation and assisted the defendant Hosford in building a house on the latter's place. In the spring of 1863 he left the county again and went to Washington territory, and "took up" a homestead on Mill plain, about two miles back of the Columbia river and eight miles above Vancouver, and about six miles east of C. O. Hosford's place. In January, 1864, he sent a letter from there to C. O. Hosford for the defendant, in which he proposed to sell the latter his donation for the sum of $400, stating, at the same time, it was "worth $5,000 in gold and silver," but that he was willing to sell it for "a little price," so as to pay the defendant Hosford what he owed him, which he said was "about two hundred and fifty dollars," and to "get a little money" for his present needs. On the receipt of this letter the defendant Hosford went to his brother's place, from which they both went to Mill plain, where they found Parkhurst alone in a hut in the timber, and very anxious for $150, wherewith to purchase an outfit to enable him to be employed in driving cattle to the mines east of the Cascade mountains. On the same day—February 12th—the terms of the sale were agreed on, and they all then went to Vancouver, where Parkhurst executed a conveyance of the premises to the defendant Hosford, which the latter had prepared beforehand and brought with him, in the presence of C. O. Hosford and H. K. Hines, a Methodist preacher of that place, in consideration of the sum of $400, paid as follows: $200 in currency as the equivalent of $150 in coin, though it was not then worth more than 65 cents on the dollar, and the discharge of the said indebtedness of $250, without interest, although the defendant wanted to charge interest thereon for four or five years at the rate of 2 per centum per month.

Within a year after this transaction Parkhurst returned to the neighborhood of the defendant, without any means, and took up his abode in the old cabin on his donation, saying, with much emphasis, that he had come to stay there. Thenceforth he led an aimless, doless life, living mainly on raw vegetables, going dirty and ragged, and often sleeping in the fence corners, saying that the devils would not let him sleep in the cabin, until August 18, 1866, when, on the petition of sundry of the neighbors, he was brought before the county judge of Polk county and duly committed to the insane asylum, under the act of September 27, 1862, (Or. Laws, 620,) as an indigent, insane person, where he remained until his death, on November 30, 1879, leaving the plaintiffs, his brothers and sisters, or their children, his sole heirs. When first committed to the asylum, Parkhurst was classed among the "doubtful" patients, but after two years he was placed among the "incurables," where he remained until his death. To the last he was impressed with the idea that some persons in Polk county wanted to kill him; and he also fancied some one was trying to chloroform him.

The evidence as to the value of the donation is very contradictory; but I am satisfied that, at the date of the conveyance to the defendant, it was not worth less than five dollars an acre, and probably more. Mr. B. F. McClench, a disinterested and competent witness, who has lived within four miles of the land since 1852, swears that in 1864 it was worth from six to eight dollars an acre, and from twelve to fifteen dollars at the commencement of this suit. But the sale by

the defendant Hosford of two-thirds of the land to the defendant Schindler in 1881, for $8.50 an acre, is a material circumstance upon this question of value. It has been suggested in the argument that Hosford made this sale for less than the land was really worth, under the apprehension that the heirs were about to claim it. But there is no direct proof to that effect, and nothing in the circumstances gives any countenance to the suggestion. The grantor appears to be a shrewd man, in good circumstances, and no immediate want of money. Neither did the sale exonerate him from liability in the premises, as his deed to Schindler contained a covenant of general warranty, for any breach of which he is well able to respond in damages.

But the consideration named in the deed—$400—is less than one-third of the real value of the property at the time of the sale, and upon any view of the matter this must be regarded as a grossly inadequate price therefor. *Seymour* v. *Delancey*, 6 Johns. Ch. 222; 2 Pom. Eq. Jur. § 927, note 3. But, as Parkhurst had a right to sell his land to Hosford for any price he chose, or even give it to him, the mere fact of gross inadequacy of price is not of itself sufficient to avoid the sale. 1 Story, Eq. Jur. § 245; *Seymour* v. *Delancey*, 6 Johns. Ch. 232; 2 Pom. Eq. Jur. § 926. But the disproportion between the price and the value of the subject is so great in this case as to cast the burden of explanation on the vendee, and require him to show that the vendor, with a true knowledge of all the circumstances, deliberately fixed on this price. But where the transaction purports to be a sale, and there is nothing in the circumstances of the case or the relations of the parties to suggest that the vendor intended or might have made the vendee the recipient of his bounty, under the guise of a sale, for a very inadequate or merely nominal consideration, such gross inadequacy of price may furnish satisfactory evidence of some serious overreaching or advantage on the part of the vendee as would justify the interference of a court of equity. Story, Eq. Jur. § 246; 2 Pom. Eq. Jur. § 928, note.

Now, there is nothing in the circumstances of this case to indicate that Parkhurst might knowingly and deliberately dispose of his property to Hosford for anything less than its real value. His only apparent motive for making the sale to Hosford was to pay him what he seemed to think he owed him, and to obtain a little money to meet his present and urgent necessities. Add to this what I think was always present in his mind, the apprehension of danger from parties in Polk county, which made him more or less afraid to live there. He declared at the time of the disposition of the property that it was worth "five thousand dollars in gold and silver," and although there was an attempt made, both in the evidence and the argument, to show that he meant $500, it came to nothing. Parkhurst was evidently a man of limited education, and the letter in which he proposed to dispose of his donation is somewhat difficult in places to decipher, more on account of the chirography than the orthography,

though that is peculiar; but the words "five thousand dollars" are as plain as any in it, and could not well be mistaken for "five hundred." And, *first*, was Parkhurst mistaken about the indebtedness to Hosford; and was he induced to part with his land upon a false impression in that respect? There is no doubt but Parkhurst thought he owed Hosford $250, and I think the discharge of this obligation was a controlling circumstance in the disposition of his property to the latter. Upon the evidence, minus Parkhurst's admission, however, I am of the opinion that the indebtedness is not proven; and that the attempt to do so is very unsatisfactory, and calculated to cast suspicion upon the whole transaction.

In the spring of 1883 the plaintiff C. T. Parkhurst came to Oregon to look after this matter for himself and co-plaintiffs. They had lost sight of the deceased, and do not appear to have known anything of his death or the disposition of his property until 1881. Parkhurst visited the defendant Hosford at his house twice in the month of April, 1883, with a view of a settlement. According to Parkhurst's testimony, Hosford first told him that the deceased owed him $800, and that he bought the property for $600, having done so to get what he owed him, but on looking at the deed admitted he only paid $400. Hosford also produced the letter from the deceased, and read it to the witness as if the latter had said the place was worth only $500 instead of $5,000, and his wife, who was present, read it the same way. Hosford said this $800 was for money loaned to the deceased to live on, and $250 he had to pay as security on a bond to get the deceased out of jail, and money he had to pay the sheriff for expenses. At the second interview, Hugh V. Matthews was present with Parkhurst, and he testifies that on that occasion the latter taxed Hosford with having read the letter to him on the former interview wrongly in respect to the phrase "five thousand dollars," and Hosford did not deny it. Both testify that he admitted that the deceased was a weak-minded man and sometimes insane on the subject of religion, but claimed that he was all right at the time of the sale and conveyance of the land. In his testimony Hosford denies having read the letter wrongly in respect to the value of the land, or that he told the plaintiff he went security for the deceased, and had to pay $250 on that account or to get him out of jail, but stated that he was indebted to him in the sum of $250 for small amounts of money loaned to him at one time and another, he could not say when, and for $172 or $72 advanced to Mr. Holman, sheriff of the county, when deceased was under arrest, to enable him to go east of the mountains, and that he never kept any memorandum of these transactions, or took any obligation or acknowledgment from the deceased on account of them. In his answer Hosford states that this sum of $172 or $72 was advanced by him to some one, presumably the sheriff, at the request of Parkhurst, as he understood, to procure his discharge from imprisonment. But it does not appear that he had any personal communica-

tion with Parkhurst from sometime before the latter's arrest until the fall of 1862, but rather the contrary.

There is no evidence that there ever was any breach of the bond given by Parkhurst to keep the peace, and the contrary is the reasonable inference from all the facts; and therefore it is quite certain that Hosford never was called upon to pay the penalty of it. And if he ever deposited any money in lieu of such bond, as was suggested on the argument that he might have done, it was not forfeited either, for the same reason, and, in the due course of proceedings, must have been returned to him within six months,—the limit for which a security to keep the peace could then have been required. Or. Code, 1854–55, p. 242. True, the magistrate who took this security might also have required Parkhurst to pay the costs of the examination, and, in default thereof, have committed him, (Or. Code, 1854–55, p. 243;) and the defendant Hosford might have furnished the money for that purpose and thereby procured his discharge from imprisonment, as he alleges in his answer he did. But there is no evidence of anything of this kind, nor is there any claim or suggestion to that effect in the argument or brief of counsel. Besides, Hosford has deliberately testified that he gave the money to the sheriff at the request of Parkhurst, as he understood, not to procure the discharge of the latter from imprisonment, but to enable him to go to the mines. Neither does it appear reasonable that Hosford would advance money to a third person for Parkhurst without any written request or communication from the latter, for such an indefinite purpose as either to get him out of jail or to enable him to go to the mines, without taking a receipt or some written evidence of the fact; and it is also improbable that he would furnish money for such a purpose under such circumstances and make no memorandum of it, nor be able to now state the amounts any more definitely than that it was either $172 or $72.

The prayer of the bill is that the conveyance to Hosford be declared null and void and of no effect, or that he and his grantee, Schindler, be required to convey the premises to the plaintiffs. If Parkhurst, at the date of the conveyance to Hosford, was a lunatic, a person generally insane,—incapable of understanding and acting intelligently in the ordinary affairs of life,—his deed is not only voidable, but void. This point is now settled for this court by the decision of the supreme court in *Dexter* v. *Hall*, 15 Wall. 9. A number of witnesses have testified *pro* and *con* on the question of Parkhurst's insanity, but none of them are medical experts, and the evidence is objected to by the defendants on that ground. The witnesses knew Parkhurst in his life-time, more or less intimately, and, having stated their relations with him and means of knowledge, expressed their opinion as to his sanity. The Oregon Code of Civil Procedure (section 696, sub. 10) permits an intimate acquaintance to testify as to the sanity of a person, the reason of the opinion being given. But the admissibil-

ity of evidence in the national courts in equity and admiralty cases is not governed by the law of the state, but by the general rules of evidence as established by the decisions of the courts and defined by approved authors and commentators. Neither section 858 of the Revised Statutes, regulating the competency of witnesses in the national courts, nor section 914, proscribing the law of procedure and practice in civil actions at common law therein, touch the question.

The question of the admissibility of the opinion of a non-professional witness upon an issue of insanity came before the supreme court lately in the case of *Connecticut Mut. L. Ins. Co.* v. *Lathrop,* 111 U. S. 612, S. C. 4 Sup. Ct. Rep. 533, when it was held admissible. In delivering the opinion of the court Mr. Justice HARLAN said: "Whether an individual is insane is not always best solved by abstruse metaphysical speculations, expressed in the technical language of medical science. The common sense, and, we may add, the natural instincts of mankind, reject the supposition that only experts can approximate certainty upon such a subject." And the "judgment" of a non-professional witness, he adds, "based upon personal knowledge of the circumstances involved in such an inquiry, certainly is of value, because the natural and ordinary operations of the human intellect, and the appearance and conduct of insane persons, as contrasted with the appearance and conduct of persons of sound mind, are more or less understood and recognized by every one of ordinary intelligence who comes in contact with his species." It is not suggested in the opinion that any particular degree of intimacy should have existed between the witness and the person whose sanity is the subject of inquiry, but that the weight to be given to the witness' opinion must depend upon the intelligence manifested by him on his examination, "and upon his opportunities to ascertain all the circumstances that should properly affect any conclusion reached," as well as the degree and character of the insanity.

Upon the issue of insanity, the burden of proof is on the plaintiffs. The law presumes that Parkhurst was sane, and capable of disposing of his property in any way he chose. *Hall* v. *Unger,* 4 Sawy. 680. His commitment to the insane asylum by the county judge of Polk county in August, 1864, as an "indigent insane" person, is *prima facie* evidence of his general insanity at that time, and so long thereafter as he was confined in the asylum in pursuance of the same. But how far, if at all, the result of this inquiry affects the question of Parkhurst's insanity in February, 1864, depends on circumstances. So far as it indicates an habitual and chronic lunacy, which, in its nature was likely to have existed for some considerable time prior thereto, it tends to show unsoundness of mind in 1864. Dr. J. R. Sites, the physician who examined the deceased on the inquiry before the county judge, and on whose certificate he was committed to the asylum, states therein that "the supposed cause" of his insanity was "religious enthusiasm and self-abuse." But the evidence is not satisfactory to

my mind that Parkhurst was generally insane—*non- compos mentis*—in February, 1864, or prior thereto, so that he was incapable of making a contract. At the same time, it is manifest that he was drifting that way, or sinking in the scale of sanity from the time of his arrest in 1860, and it is probable that that fact, with the attendant circumstamces, did much to impair his mental equilibrium. Two delusions or *manias* followed this event, and were largely consequences of it: one, that a mob in Polk county purposed to do him bodily harm, and another, that Hosford had in some way incurred an expense or charge of $250 in getting him out of the clutches of the law. It is not proved that Hosford intentionally caused, or directly promoted or encouraged, these delusions, although there are some circumstances in the case calculated to excite suspicion that he did. For instance, at the time of the purchase of the premises, he undertook to make Parkhurst believe that he owed him interest on the $250 at the rate of 2 per centum per month for about five years, which would have amounted to $300, and swallowed up, twice over, the small sum in money which Parkhurst was expecting to receive for his present necessities; and this, too, in the face of the fact that by his own admission there was no contract to pay interest, and when he must have known that by the act of October 16, 1862, (Or. Laws, 623,) then in force, that only 10 per centum per annum could be recovered in any case where there was no contract to pay more, and then only for 12 per centum per annum, and that prior to that time there was no law regulating interest in the state, and that none was recoverable, except where there was a special contract to that effect. And poor old Parkhurst does not seem to have known enough to dispute directly this unconscionable claim, but, prompted by his necessities, he pushed it one side, insisting that, however that might be, his proposition was that he would take $150 over and above what he owed Hosford, be that more or less, which sum was finally paid him in greenbacks at $20 more than their market value.

But while it is not proven that Hosford is responsible for the delusions under which Parkhurst labored, it does satisfactorily appear that he took advantage of them to purchase the premises for a grossly inadequate price from a man who had long confided in him, and whom he knew to be much in want and generally weak in mind. This being the case, the sale and conveyance to Hosford was inequitable, fraudulent, and unjust, (*Scovill* v. *Barney*, 4 Or. 291; *Holmes* v. *Holmes*, 1 Sawy. 103; 2 Pom. Eq. Jur. § 928;) and, so far as he is concerned, he must be treated as trustee for the heirs. The defendant Schindler is a *bona fide* purchaser for a valuable consideration, unless it appears that he had notice of the plaintiff's equity at the time he made the purchase, or information thereof sufficient to put him on inquiry whereby he might have ascertained the fact. The only evidence upon this point is the testimony of M. Croisan, a German, who appears to have lived in the neighborhood from about 1876.

He testifies that about the time Schindler was negotiating for the purchase of this land he told him, substantially, that there would be trouble about it some day; that the general talk was that Hosford had gotten the land unjustly from a crazy man. This is denied by Schindler in a general way, to the effect that he had never heard anything against Hosford's title; and from the fact that he is a German and does not speak English, and appears to have been poorly interpreted, his testimony is general, vague, and indefinite. But, admitting that Croisan told him what he said he did, it is not sufficient to charge him whith either "notice" or "knowledge" of the plaintiff's equity, or the invalidity of Hosford's title. It did not constitute "notice," because Croisan was a mere stranger to the property and the parties, and in no way interested in the transaction. 2 Pom. Eq. Jur. 602; *Hardy* v. *Harbin,* 1 Sawy. 203. It did not impart "knowledge" of the plaintiffs' equity to Schindler, because Croisan knew nothing about the matter, and did not profess to. He only repeated what he said was rumored in the neighborhood,—that Hosford had obtained the property of a crazy man, unjustly, some 16 or more years before. Neither was it sufficient "information" to put Schindler on inquiry. It furnishes him no clue or guide to an investigation of the matter, and pointed to no person or place where information could be obtained.

If a person about to purchase an interest in real property obtains or receives information tending to show the existence of a prior adverse right to such interest, which information, considering its character and source, is sufficient to put a prudent man on inquiry, which inquiry, if prosecuted with reasonable diligence, would lead to a discovery of such prior adverse interest, then the reasonable inference is that he acquired such knowledge and had actual notice thereof. And if such person negligently, or for the purpose of keeping himself in ignorance, fail to make such inquiry, he is nevertheless chargeable with "notice" of the facts he might thereby have ascertained. But such person is not affected by mere rumors, hearsay statements, vague suggestions, surmises, and the like, concerning the existence of such prior adverse interest. The information must be credible in its character and source, and sufficiently circumstantial to furnish him with a palpable clue or guide by means of which he may investigate the matter and ascertain the truth. 1 Story, Eq. Jur. § 400a; 2 Pom. Eq. Jur. § 597. In 1881 Schindler had no means of ascertaining whether Parkhurst was insane or not in 1864. The information which Croisan says he gave him on the subject amounted to nothing. Even after this thorough investigation of the subject with the aid of the process of this court, and the diligence and astuteness of learned and industrious counsel, this court is unable to say that Parkhurst was generally insane at the date of his conveyance to Hosford, and that, therefore, the same is *ipso facto* void and of none effect.

I find that the defendant Schindler is a purchaser in good faith

and for a valuable consideration, without notice or information of the prior equity of the plaintiffs, and therefore the bill as to him must be dismissed, with costs. As to the defendant Hosford, a decree will be entered that within 30 days he convey to the plaintiffs by a good and sufficient deed, with a warranty against his own acts, that portion of the Parkhurst donation not heretofore conveyed by him to the defendant Schindler, and that he also pay to the plaintiff a sum of money equal to the price received by him from said Schindler for the remainder of said donation, to-wit, the sum of $1,804.85, together with $457.22, the legal interest thereon, from the date of the sale to Schindler, to-wit, August 29, 1881, in all the sum of $2,262.07, and that in default of said payment within 30 days the plaintiffs have execution therefor. The bill also prays for an account of the rents and profits; but the matter was not pressed on the argument, and I have concluded on the evidence that the amount paid Parkhurst, with that expended in taxes, repairs, and improvements, is sufficient to offset the claim for rents and profits.