## BEALE v. GIBAUD.
### No. 1157–A.

District Court, W. D. New York.
April 6, 1936.

Adler & Adler (by Isaac Adler), all of Rochester, N. Y., and Cyrus W. Beale, of Richmond, Va., for plaintiff.

Whitbeck & Dye (by Ernest C. Whitbeck) and Clarence P. Moser, all of Rochester, for defendant.

KNIGHT, District Judge.

This action is brought to recover on two promissory notes, each dated May 19, 1925, executed by Hoyt C. Le Master, delivered and payable to the defendant. One note is for $4,283, payable at West Palm Beach, Fla., with interest, and maturing May 19, 1927, and one note is for $4,284, payable at the place aforesaid, with interest, and maturing May 19, 1928. Both notes, upon the face thereof, provide for the payment of reasonable attorney's fees for making collection thereof, and also for the payment of interest on deferred interest payments. Each note recites that the maker and indorser waive demand, notice of nonpayment and protest. The above-mentioned notes, with two other notes, were executed and delivered by the maker to the defendant in part payment of the purchase price of certain real estate situated in Florida, for which the agreed price was $26,000.

On November 21, 1925, the James Ebert Company, for the purported consideration of $33,000, conveyed to the defendant certain real estate in Florida, and as a part of the consideration thereof, the defendant indorsed and delivered to that company three of the aforesaid notes. Two of the notes given by Le Master were paid. One of these was paid to James Ebert Company. One was paid to the defendant or his order. At least there is no showing to the contrary. These four notes were secured by a second mortgage on premises conveyed by Le Master. The first mortgage was foreclosed and nothing was realized on the second mortgage.

The foregoing statement of facts is not denied. The complaint alleges, among other things, that the plaintiff purchased the two notes above described from the James Ebert Company in March, 1927, and paid $6,500 therefor; that the plaintiff has been the holder and owner of such notes since their purchase, and that the only payment thereon is $603.12 paid in May, 1929.

Plaintiff further alleges that he has expended $935.75 in disbursements in the attempt to collect such notes, and that the reasonable unpaid attorney's fees therefor are $2,000. While the answer denies the transfer of the note by the aforesaid indorsements, and denies that the plaintiff became the owner and holder before maturity, and denies demand for payment and notice of nonpayment, there is no proof in contradiction of the above-mentioned allegations, saving and excepting as such denials are claimed to be supported by the allegations in an affirmative defense in the answer that the defendant was wholly incompetent and insane when the notes were executed, and that this was known to the plaintiff when he procured such notes, and that he was then put upon his inquiry. As a further affirmative defense, it is alleged that after his indorsement defendant rescinded the indorsements and returned all benefits received therefrom. The issues are narrowed to the competency of the defendant at the time of the indorsements of the notes and the defense of rescission, as questions of fact, and to whether the plaintiff is a holder in due course, as an issue of law.

The rule applicable in this case in deciding the question of competency is well and thoroughly stated this wise: "The test of mental capacity to contract is whether the person possesses sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he is engaged; and in order to avoid a contract it must appear not only that the party was of unsound mind or insane when it was made, but that this unsoundness or insanity was of such a character that he had no reasonable perception or understanding of the nature and terms of the contract. However, the insanity need not be so great as to dethrone his reason or as to amount to an entire want of reason, but it is sufficient if he is insane to such an extent as to be incapable of comprehending or understanding the subject of the contract and its nature and probable consequences." Corpus Juris, vol. 32, § 496, p. 727. This rule is uniformly followed and finds support in many federal and state courts. In effect, this means that it must appear that the defendant, at the time of the indorsement of the notes in question to the James Ebert Company did not possess "sufficient mind to understand, in a reasonable manner, the nature and effect of" his act in connection

with the transaction of the Ebert purchase. This is in nowise in conflict with the numerous authorities cited by defendant. Edwards v. Davenport (C.C.) 20 F. 756; In re Delinousha v. National Biscuit Co., 248 N.Y. 93, 161 N.E. 431; Aikens v. Roberts (Sup.) 164 N.Y.S. 502.

The indorsements being admitted, the burden is upon the defendant to establish these facts by a fair preponderance of the evidence. "One who alleges the mental incapacity of a party to a contract must establish it by a preponderance of the evidence." 13 C.J., § 978, p. 778.

It is not claimed that the defendant was permanently or continuously insane. He has never been adjudged to be insane. It is claimed that he was suffering from "an exalted phase of manic depressive insanity," described as a recurring condition of a mental disease during which recurrence the individual disregards "the impulse of inhibition that a man ordinarily uses in normal health in checking up his transactions," and the individual is "led by his rosy promise of great success in his transactions."

In 1923 and until March, 1924, he was an inmate for observation for short periods, except in one instance, at various health institutions, including Bloomingdale Hospital. From that time until 1929 there is no record of any institutional attendance or observation. The transactions involved here occurred in November, 1925. Little, if any, question is made that defendant was competent to transact business in May, 1925, when the Le Master sale was made. Numerous transactions of major importance intervening May and November, 1925, are not claimed to be invalid by reason of incompetency. It is asserted that a recurring condition of this type of insanity began again to show itself in October, 1925, and continued for at least three months thereafter.

The record discloses an extraordinary situation. While it appears that in 1923 and 1924 defendant was suffering from some type of mental disability, from that year on to the early part of 1928, at least, defendant conducted his business of considerable volume and carried out many real estate transactions in the ordinary and usual way without let or hindrance. Assuming the defendant to be a victim of manic insanity, the record discloses, and the testimony of both physicians called on behalf of the defendant shows, that, intervening these periods of mental exaltation or depression, the defendant was able to carry on his business with an understanding and comprehending mind. Certain of defendant's activities will be taken up in the order of their sequence.

All the transactions connected with the Le Master sale reflect normal activities and mentality. Negotiations concerning the sale continued several days. A temporary written contract was first made. Later, defendant and his wife executed the deed of conveyance. The purchaser executed to the defendant a mortgage on the premises and several notes. During these negotiations defendant was represented by his attorney.

On June 26, 1925, in Rochester, N. Y., where defendant made his home, he and his wife leased certain lands to one Keenan for $8,000 a year for five years and $12,000 for each of two succeeding years. On September 1, 1925, defendant and his wife conveyed the five parcels of property to Keenan for $65,000, receiving $5,000 in cash, the balance being secured by a mortgage. The various instruments of conveyance were executed with the approval of the attorney for the defendant. The attorney. testified that defendant was then competent to enter into these transactions. In November, 1925, the Ebert Company transaction concededly took place. Unless it is found in the price paid for the Ebert property, there is no evidence showing any act of the defendant then indicating an unsound mind or mental incapacity. Defendant introduced the subject of the purchase. He bartered with Ebert over the price. Ebert refused to sell for less than $35,000. All this took place about November 1, 1925. Some two weeks later defendant opened up negotiations again, resulting in an agreement by the terms of which $33,000 was fixed as the purchase price. On November 21, 1925, an agreement of purchase was executed by the defendant. This called for the payment of $1,000 in cash, $4,000 on delivery of the deed, $7,150 by a three month's note, secured by a second mortgage on the property, and $12,850 represented by three Le Master notes. When the agreement was made, $1,000 cash was paid. Two days later, purchaser and seller went to defendant's attorney's office where the deed was executed, $4,000 cash paid by defendant to Ebert, the note for $7,150 executed, mortgage collateral to it executed, and the three Le Master notes indorsed by defendant to Ebert. Mr. Hatfield, the

attorney, acted for the defendant in these transactions. The instruments of the written documents are all in the usual form.

A photograph of the house so purchased has been introduced in evidence. It is not necessary for the court to take judicial notice of the so-called Florida boom in real estate during that period. The evidence discloses that Florida real estate then reached high valuations in an excited and exciting market. There is evidence to sustain the claim that the $33,000 was then a fair value for this property. At least it cannot be said that the price paid and value were so unequal as to raise any presumption that the purchaser was mentally unsound, or, indeed, to establish any fact as bearing upon the question of such unsoundness.

In December, 1925, the defendant and his wife conveyed several lots in Florida to N. Saadi, for the consideration of $45,000. Saadi saw the house advertised for sale, met the defendant and discussed terms of purchase. Defendant at first asked $55,000 for it; Saadi offered $45,000. This offer the defendant, at first, refused, but later accepted. The terms of this sale were $10,000 in cash, $3,500 in rugs in which Saadi was a dealer, and the remainder in three installments, secured by a mortgage on the property. The conveyance was made subject to a first mortgage of $6,000. The evidence discloses that negotiations for this purchase first took place in the latter part of November, 1925. The deed was executed by Gibaud on December 4, 1925. The mortgage, it appears, was executed some days later. This transaction, like those with Ebert, was carried out with the knowledge of defendant's attorney and closed under his supervision. The attorney testified that defendant then, in his opinion, was able to "understand that he was selling that property to Mr. Saadi and what he was getting for it." On December 17, 1925, Saadi executed and defendant's attorney witnessed the mortgage given as a part of the consideration. The evidence, relating to the conduct of the transactions under the guidance or legal advice of defendant's attorney, is most significant, when considered in connection with the attorney's testimony offered to show that the defendant was incompetent during these periods. The court is loath to believe that these acts, if true, indicated to the attorney an abnormal mind. In December, 1925, the attorney refused to carry out certain directions of the defendant with regard to several purchases. The record supports the conclusion that at this time some check was being attempted to be made by others on defendant's real estate activities. As regards the Saadi sale and the value of the real estate sold and the rugs taken as a part of the purchase price, we have only to repeat that these transactions took place in the so-called real estate "boom" period. It is also significant that only a few days subsequent to these transactions of November 23, 1925, the attorney testified to various acts of the defendant which impressed him as irrational. While Mr. Hatfield, the Florida attorney, during a period in which he had communications from defendant's Rochester attorney and the defendant's wife, refused to carry out defendant's instructions with regard to certain purchases, three separate transactions with the defendant were closed during that month. During this period, December, 1925, and in January, 1926, defendant's wife and his Rochester attorney were solicitous about certain of these Florida transactions. Such solicitations naturally might arise from the feeling of probable financial loss.

Aside from his real estate activities, defendant, during this time, and for a considerable time preceding this, had been engaged in the auto supply business with his brother-in-law, one Stoffel, at Rochester, N. Y. January 1, 1926, he sold his interest in this business to his partner. An inventory of the stock was made. The terms of purchase were agreed upon between Stoffel and the defendant. While Stoffel testified that he figured defendant was irrational, he also testified the deal itself "was a perfectly rational deal" and "the price paid was a reasonable price." On January 16, 1926, Dunton and one conveyed certain lots to Gibaud and Gibaud contemporaneously therewith executed a mortgage of $500. This mortgage was paid and discharged March 18, 1926. Again, on January 16, 1926, two lots at West Palm Beach, Fla., were conveyed to the defendant, and defendant then executed the purchase money mortgage thereon. This mortgage was later paid. On February 26, 1926, defendant paid to Ebert $7,150 to pay a note in that amount given on the purchase of the Ebert property, and the mortgage securing that note was paid. This also is a most significant transaction. These transactions took place at the office of defendant's attorney. Defendant and his wife were present.

Important business transactions by the defendant in 1926 are disclosed. He did a very substantial banking business during that time. On January 19, 1926, he deposited $15,000. At other times large deposits were made by him. His account shows 13 separate deposits and 37 separate withdrawals in six months. Defendant continued to own the Ebert property until February, 1928, when the property was reconveyed to the Keystone Construction Company pursuant to an agreement then made with Ebert. Gibaud conveyed the property to Ebert subject to a mortgage of $8,000 and for the consideration of $3,000 represented by note of the Ebert Company and secured by stock of the Ebert Company. The Ebert Company subsequently went into bankruptcy, and the value of the note was nil. This transaction was two years and three months after the purchase by the defendant. There is nothing in the case showing that the defendant at any time prior to February, 1928, did any act in the way of a rescission or disclaimer of the purchase of November, 1925. Testimony has been given on behalf of the defendant that when the Ebert property was conveyed back, as stated, Ebert agreed to cancel the notes endorsed to him. Ebert denies this. I am disinclined to believe the testimony so given.

On April 1, 1926, James Ebert Company assigned the notes in question together with the mortgage given by Le Master securing them to one Baker. That assignment was recorded December 26, 1926. On February 26, 1927, Baker assigned the aforesaid mortgage and notes to the plaintiff. This assignment was in writing. It was recorded in the office of the clerk of the circuit court, Palm Beach county, Fla., on March 16, 1927. By the terms of these assignments only the two notes in question were transferred and secured. The plaintiff paid $6,500 for two notes of the aggregate principal of $8,567.

There is evidence of numerous transactions carried on by this defendant in Florida in the year 1925 and evidence of contacts with him by several business acquaintances, which included evidence of numerous advertisements negotiated with an advertiser. There is evidence from a business associate of his contacts with the defendant in 1925 and 1926 and evidence of officials of the Citizens Bank in West Palm Beach as to transactions there. The cashier of such bank testified that defendant carried an account with the bank on numerous occasions, gave checks for credit and checked against his account; that he took acknowledgement of instruments for the defendant and during the winter of 1925 and 1926 he saw him practically every day. In answer to the inquiry as to whether the acts and conversations of defendant to which he testified were those of a rational or irrational person, the cashier stated that "They were those of a rational person." Another witness, a partner or associate of Saadi, answered in detail as to transactions with the defendant about the Saadi purchase. This witness and an automobile sales agent also testified to certain acts of and conversations with the defendant and testified that in their opinions such acts and conversations were those of a rational man.

The defendant has introduced in evidence a number of letters written by defendant in December, 1925. While it may be said that these letters contain somewhat unusual phrases, taken as a whole, none may be said to lend any considerable support to the claim that the writer did not then know and comprehend what he was then writing. The letters are entirely intelligible. They are mostly made up of expressions of business success and interest in and the reason for interest in those to whom they were written. Copy of one of defendant's letters follows:

"Dec. 12th

"My Dear Martin

."I got your letter and not surprised to hear from you in the way you wrote. Yes I will sell the Cash Auto Supply to you any time you are ready, get ready your proposition Will be home Christmas, and will be glad to close with you on some basis I did with the boys you are in title to it May not have it, I have bot—5 houses since I sold 318–12th St. Will have a profit of at least 200 thousand by Feb 1st You must not tell dear wife, she sure worry very much how I spend my money, I will settle that question soon after Christmas. Wife must not interfere in my work. I love her, and Will, love lot. Six lots. With the houses making a total of purchases amount to 146 thousand so far, and I will clear 200, this season, have a new Chrysler, and new Pierce Will get what I want when I want it

"By-By until Christmas

"Louis"

There is some lay testimony given by relatives; by a brother-in-law, by two acquaintances; and by the wife of the defendant. Each testified to certain facts claimed to impress him as irrational. Saving and excepting the testimony of the wife, the conclusions of these other witnesses are not justified in the light of the entire record of their testimony.

Dr. Amsden of Bloomingdale Hospital testified that in 1923 and 1924 this defendant was suffering with what is known as manic depressive insanity and that this is a mental disorder which exaggerates "beyond normal limits of tendencies which we all display." The excited phase is one in which the individual is "exhilarated, exalted. He has optimistic ideas of his capacities, his projects." "They may have delusions, they are not characteristic." A symptom of this type of insanity is that the individual is "over active in the sense that he has many schemes, and his ideas come very rapidly, one after the other. * * * So that a rather fantastic idea may absorb him and he may act upon it." Another symptom is quickness of movements. In answer to the inquiry as to how these conditions or symptoms affect his memory, Dr. Amsden testified: "Well, his memory is not affected primarily; it may even be sharpened. * * * after that period of excitement, not recall things which he did or things which he saw or things which occurred, but, ordinarily, his mind—his memory is not affected." The depressive phase of this type of insanity is characterized by a depressed and despondent attitude, slowness of mind and a feeling of physical inadequacy. Testimony of Dr. Amsden was given in great detail, and in answer to the hypothetical question put to him by the defense, he stated his opinion to be that defendant was insane when the November sale was made. His testimony is that this type of insanity may occur and reoccur at different intervals and that it is brought on by various conditions. His testimony is that it comes on gradually and takes some weeks to develop.

Dr. Angell, called by the defendant, also testified at great length. His testimony in substance is the same as that of Dr. Amsden as to the alleged disease and symptoms shown by it, its causes and its results. Dr. Angell examined the defendant in 1923, when, as he claims, he was suffering with manic depressive insanity. He did not see him again until May 11, 1926. The doctor described this type of insanity as follows: "Manic depressive insanity is a mental disturbance produced by excess congestion of the corticle area of the brain, the part that has to do with purpose and intent, and having symptoms that are very apparent, at first more or less depression, followed by a period of great exaltation and boastfulness and assurance that whatever they undertake would turn out well, very well, and after that there is a flight of ideas; that is to say, his mind goes from one thing to another—the mind of the patient goes from one thing to another very rapidly, disconnectedly * * * and in that condition he will make, or go into those projects irrespective of what the future may have in store for the result of the projects. * * *" Based upon the hypothetical question put to him, he stated his opinion to be that defendant was insane in November, 1925.

He did see him in October, 1926, when, he states: "He seemed to be perfectly well apparently." Dr. Angell testified that in November and December, 1925, when defendant signed notes, he knew what he was signing and when he indorsed notes he knew what he was indorsing. In answer to the inquiry regarding the sale of November 23, 1925, as to whether or not defendant understood what he was doing, Dr. Angell testified: "I think he understood what he was doing, but I believe that the state of mind—they often do, especially so far as counting the cost and that sort he would do it, but his condition was so that he was suffering at that time, * * * from a manic phase of manic depressive insanity." In answer to the question as to whether he then understood the effect of what he was doing, he answered "Yes, but he would sign a paper whether it was satisfactory or not if he wanted to, if at that time he wanted to." This question and answer appears of record: Question: "Well, if I understand you right you mean, he might have had an exaggerated idea of what the future, or what the results might be to him ultimately, but so far as the specific thing he was doing was concerned, he understood it perfectly?" Answer: "Understood it perfectly at that time." After 1926, Dr. Angell did not see the defendant until June, 1929; when, as he described it, there was some indication of apparent manic depressive insanity.

We may well conclude from the testimony of these physicians that at different times defendant suffered from a type of manic insanity. We may equally well conclude that this insanity was not continuous; that during certain periods defendant was not competent, and at other periods he was competent.

Aside from the testimony of the physicians, the principal testimony as to the mental attitude of the defendant comes from the wife of the defendant. She describes the defendant as being of calm and quiet temperament, considerate and business-like in his transactions down to 1922, when he began to indicate periods of excitement. He became depressed, sleepless, at periods he seemed normal and at other times very excitable. She tells about his conversations and describes his acts on many occasions and claims they impressed her as irrational. She testified that in 1923 he went into the automobile sales business; that he conducted it a short time and then was taken to a sanitarium at Canandaigua; that during 1923 he had exaggerated ideas of his own business ability and his financial worth; he bought another business, Davis Machine Tool Company, and at that time was engaged both in the tool company business and in the automobile business; that later the defendant went to a sanitarium at Yonkers and to Bloomingdale, at White Plains, where he remained until early 1924. He seems, according to her opinion, to have become normal a few months later, and he did some considerable business in Florida real estate in 1924. She testified that defendant came back from Florida in the early part of 1925, and he was then very depressed and this continued in the early months in 1925, but "in September he felt better and in October he wanted to go to Florida; he wanted to do something." She testified that before he went he turned over the business to the boys in his store and "went through the house and he took out everything that belonged to him, and I watched him do that. * * * He packed the car with those things. Then as he was leaving, he told me, he says: 'Mother, I am never coming back'; and said 'goodbye, I am never coming back' "; that he remained in Florida until December 24, 1925, and when he came back there was a noticeable change in his conduct both towards his wife and others, and, further, "that winter of 1927 and in the fall he was more calm than he had been other years" and that there was a recurrence of this cycle in 1929. This witness, the wife, joined in the conveyance of the Ebert house to Saadi in December, 1925. She joined in different conveyances in 1925. When questioned as to her signature on the Saadi deed, she testified that she did not know whether it was her signature. This deed appears to have been acknowledged by her before one of her attorneys. The wife knew of the several transactions with Keenan and joined in these conveyances running from June, 1925, to January, 1926. The acts of the wife, it seems to me, show the facts more than does her testimony. It seems unreasonable to believe that many of the things which she claims to recall could have taken place if she deemed these acts to be irrational; and that after the experience had in 1923 and 1924, during which defendant executed a contract which was subsequently set aside, defendant would have been permitted to continue to engage in the ordinary activities of a business and especially conveying real estate time and time again without some definite determination of his mental condition. Naturally the wife would have been concerned with the result of his acts. At no time from the summer of 1925 until the spring of 1926 was the defendant attended by a physician. Taken in its entirety, the testimony of the wife falls far short of showing that this defendant was incapable of understanding the nature and force of the transaction of November, 1925.

Reference has been made only to a meager portion of the record in this case. This defendant, like many others, was dealing in Florida real estate in the well-known boom times. Any individual, with the clearest mentality, who was interested in transactions following rapidly one after another and resulting in large gains, would normally have exhibited considerable hilarity and excitement, and in times of losses, excitement minus hilarity. So far as this record shows, far from sustaining the defendant's burden of the proof, it shows that the acts of defendant at this time were of the usual normal individual under the then existing circumstances. In my opinion, this defendant at the time of the indorsement of notes in question possessed "sufficient mind to understand, in reasonable manner," the nature and effect of the transactions of which the transfers of these notes were a part.

Assuming that this defendant was insane to the extent that he was not capable of understanding the nature and the effect of the indorsements made by him, it is asserted that such indorsements were void, not only as to the indorsee but as to all assignees of the indorsee prior to maturity. In other words, it is claimed that the contract of an insane person is absolutely void and that no one can obtain any rights by virtue thereof. It is said that the federal rule is that a contract of a person of unsound mind is void and not voidable, and support for this contention is claimed to be found in the early case of Dexter v. Hall, 15 Wall.(82 U.S.) 9, 20, 21 L.Ed. 73, in which it is said: "The fundamental idea of a contract is that it requires the assent of two minds. But a lunatic, or a person non compos mentis, has nothing which the law recognizes as a mind, and it would seem, therefore, upon principle, that he cannot make a contract which may have any efficacy as such." Hall was an inmate of an insane asylum when the power of attorney was executed. This decision is based upon the holding in Thompson v. Leach (Eng.) 3 Salk. 300, and certain English text writers. It is recognized that the decision is in conflict with the statement of law as made by Blackstone in his Commentaries, vol. 2, p. 291, wherein he states: "Idiots and persons of non-sane memory * * * are not totally disabled either to convey or purchase, but sub modo only; for their conveyances and purchases are voidable, but not actually void." While the statement of the law as declared in Dexter v. Hall, supra, is broad, in considering its effect, it is essential to consider the facts. The instrument in question was a power of attorney, not a deed of conveyance. The trial court said: "If, * * *, he was insane, and his insanity was general, the instrument was a nullity, and no title could be transferred under it." Dexter v. Hall has been followed in a number of federal cases, cited by defendant, including Edwards v. Davenport (C.C.) 20 F. 756, in which particular case the party sued was charged with notice upon the facts; Anglo-California Bank v. Ames (C.C.) 27 F. 727, 729, wherein it was held that an indorsement made by one of unsound mind "was no valid contract of endorsement. * * * It was no better than a signature written in a state of somnambulism, or even than a forgery," but in which it was said that the incapacity was obvious and pronounced, and in which the indorsement was obtained

by fraud and a deception, and which case quotes the following from Wirebach's Ex'r v. First National Bank, 97 Pa. 543, 39 Am. Rep. 821: "In the case of a lunatic, however, he [endorsee] may recover, provided he had no knowledge of the lunacy, and the note was obtained without fraud, and upon a proper consideration;" Plaster v. Rigney (C.C.A.) 97 F. 12, in which it was held that the defendant could not invoke the statute of limitations since the statute had not run from the expiration of the period of the plaintiff's insanity; Clark Car Co. v. Clark (D.C.) 11 F.(2d) 814, which concerned a power of attorney, and in which the decision in part was based upon the fact that there was lack of evidence of any ratification. While we do find the broad assertion in the foregoing cases and some other federal and state cases that a contract made by an incompetent is absolutely void, it is quite clear that this is contrary to the great weight of authority today as is evidenced by many opinions and the text-books of many well-known authorities on the subject of contracts.

The rule which finds support in many of the authorities today is stated as follows: "While some confusion has arisen by reason of the misuse of the terms 'void' and 'voidable', and some cases have asserted that the contract of an insane person, who has not been so judicially adjudicated, is absolutely void, and not merely voidable, the general rule, supported by the weight of the authority, is that a contract of an insane person, who has not been so judicially adjudicated, is not absolutely void, but voidable." 32 C.J. § 501 (c) p. 729.

Black on Contracts (2d Ed.) vol. 2, p. 255; Elliott on Contracts, (Accumulative Supp.1913-1923, § 3820; Page on the Law of Contracts, Supp.1919-1920, § 1634 et seq.; Bishop on Contracts, § 873; Kent's Commentaries, Vol. 2, 451; Chitty on Contracts (18th Ed.) p. 158, by MacFarland & Ragman; all, in effect, declare that the doctrine that conveyances by an insane person are absolutely void is against the "immense preponderance of authority. They are voidable where the person has not been judicially declared incompetent." It is recognized that the insane person may affirm by acts after becoming sane or by failure to disaffirm for a long period of time after becoming sane. It is likewise recognized that fraud or deceit may vitiate the contract. Luhrs v. Hancock, 181 U.S. 567, 21 S.Ct. 726, 729, 45 L.Ed. 1005, states

the true rule of law to be followed in this case. That case involved the question of the competency of an individual to execute a note and a mortgage. The Supreme Court there said: "The deed of an insane person is not absolutely void; it is only voidable; that is, it may be confirmed or set aside." Weeks v. Bridgman, 159 U.S. 541, 16 S.Ct. 72, 40 L.Ed. 253; 46 A.L.R. 419; Smith v. Ryan, 191 N.Y. 452, 84 N.E. 402, 19 L.R.A.(N.S.) 461, 123 Am.St.Rep. 609, 14 Ann.Cas. 505, 507; 6 Eng. Ruling Cases 76, quoting the rule stated by Lawson.

In the recent case of Kevan v. John Hancock Mut. Life Ins. Co. (D.C.) 3 F. Supp. 288, we find a definite pronouncement that contracts entered into by insane persons not adjudicated insane are voidable only and not void. In numerous cases the question of whether there has been an adjudication has been the determining factor as to whether the contract is voidable or absolutely void. The general rule laid down in the state courts is stated in Blinn v. Schwarz, 177 N.Y. 252, 69 N.E. 542, 545, 101 Am.St.Rep. 806, wherein it is said that "although the decisions of the courts upon the subject are not uniform, according to the weight of authority in this state, as well as elsewhere, the deed of a lunatic before office found is voidable only and not void."

In The Mutual Life Insurance Co. of N. Y. v. Hunt et al., 79 N.Y. 541, it was held that contract executed upon a valuable consideration "in good faith, without fraud or unfairness, and without knowledge of the insanity or notice or information calling for inquiry," was enforceable. English cases are there cited, among which is Elliott v. Ince, 7 Deg., M.&G.(56 Eng.Ch.) 487, in which it is said: "The principle of that case (Molton v. Camroux (2 Exch. 487) was very sound, viz.: that an executed contract, when parties have been dealing fairly, and in ignorance of the lunacy, shall not afterwards be set aside; that was a decision of necessity, and a contrary doctrine would render all ordinary dealings between man and man unsafe." This case, and the cited cases, were decided upon the principle that "he who seeks equity, must do equity."

The instant case points the unfairness of the strict rule stated in Dexter v. Hall, supra. Concededly this defendant at intervals was competent. Concededly he was competent some time subsequent to the in-dorsement of these notes. During these periods of conceded competency extending over a considerable period of time, he seems to have carried on and conducted various and important business activities with a normal mind. If it is conceded that he was incompetent in November, 1925, it is unreasonable to say that acts done by this particular individual during incompetency cannot be affirmed not only by his failure to rescind after a very considerable period of competency, but by his performance during competency of the conditions of the agreement entered into during incompetency. This contract, as I find, was executed for a fair consideration. There is no evidence of fraud or undue influence. This is not an executory contract, but an executed contract, and the plaintiff was a purchaser without notice.

"A contract made prior to an inquisition of lunacy is not necessarily, but only prima facie, invalidated by a finding that the person was insane when it was made; it is not void. * * * However, in most jurisdictions, by force of statute, an adjudication of insanity raises a conclusive presumption of its continuance as long as there is no subsequent adjudication of restoration to sanity." 32 C.J. p. 731. In many of the state courts, irrespective of statute, it has been held that the "presumption of its (lunacy) continuance is conclusive to all dealings after the inquisition until it has been superceded." The cases make the distinction that a contract entered into by a lunatic then under an adjudication of insanity is void and that a contract made by an insane person prior to adjudication or subsequent to discharge as sane is voidable. These principles are so well established, and the cases are so numerous in the state courts, it seems superfluous to give further citations.

It is urged that, assuming the contract in suit was voidable, the plaintiff must fail because the defendant has not received the benefit of a consideration for the contract. Incompetency having been established, the burden rests upon the plaintiff to show that the contract was entered into in good faith, without fraud and for a fair consideration. It is the absence of good faith and fair consideration and the presence of fraud, which makes the contract with one not adjudicated insane voidable. To entitle the plaintiff to succeed, it, therefore, must be made to appear that a fair consideration was given.

"The rule that the bona fide contract of an incompetent is voidable only where the parties can be placed in statu quo is subject to the exception that where the incompetent has not received the benefit of the consideration, the contract will be set aside without a return of the consideration, although it was made in good faith and before an adjudication of incompetency."

The theory upon which the contract of an incompetent is held to be voidable is based upon the premise that the incompetent, having received substantial benefit, it would be unjust to permit him to avoid the obligation of the contract without return of the consideration. I find the fact to be in this case that the defendant did receive a fair consideration for the indorsement of these notes and that the contract was made without fraud and in good faith. There is no question, therefore, as regards the effect of lack of consideration.

■ There is still this further fact. Defendant ratified the contract when competent. Such being the fact, defendant was not in a position thereafter to complain that there was no consideration. He was estopped by this ratification. All this is said, disregarding the question of the plaintiff being a holder in due course. Cockrill v. Cockrill (C.C.A.) 92 F. 811; 32 C.J. 737.

The Florida statute, section 6818 (Compiled General Laws, section 4732, R.G.S.) provides that the burden is on the holder to prove that he acquired title as a holder in due course where it is shown that the person who negotiated the instrument was defective. Had the defendant promptly proceeded to avoid the contract, the plaintiff would have obtained no better title than the indorsee or his assignee. "Such legal incapacity to enter into the contract follows the instrument even into the hands of a holder in due course. If the defendant was incapable of contracting with the payee, he is equally incapable of contracting with a subsequent holder in due course." Bigelow on Bills, Notes and Checks (3d Ed.) § 531; Smoot's Law of Insanity (1929) § 354 et seq.

■ It is urged by the defendant that "the burden is on the plaintiff to show that he was ignorant of the defendant's incapacity, that he had notice of no fact which would put a reasonably prudent person upon inquiry as to defendant's incapacity, that no unfair advantage was taken of the defendant by plaintiff or by the person under whom the plaintiff claims, that the transactions were fair, open, voluntary and well understood and with adequate consideration, and that the defendant has not and is not able to restore the consideration or to make adequate compensation therefor." It is my opinion that the plaintiff has sustained the burden in all these respects.

■ There is a rule of the federal law that "When the question arises in the federal courts in cases involving contracts generally it is considered one of general law which the court may determine uncontrolled by the decisions of the local state courts." Federal Law, Contracts, vol. 2, § 336.

It does not seem to me that the question of whether a contract of an incompetent is voidable or void is such a matter of a general law as is determinable by the federal courts without control by local court decisions. Even were this question a matter of general law, it may be said that the Supreme Court has not decided that a contract is absolutely void under facts that are comparable here. As pointed out, Dexter v. Hall, supra, involved competency to execute a power of attorney. Taking the opinion as a whole, it seems that it was the intent to limit the holding to that particular type of contract and upon facts not like those presented here. Further, Luhrs v. Hancock, supra, states the true rule of the federal court upon instruments of conveyance or transfer by an incompetent.

In United States v. Guaranty Trust Co., 293 U.S. 340, 55 S.Ct. 221, 223, 79 L.Ed. 415, 95 A.L.R. 651, it was said that "under settled principles of conflict of laws, adopted by both federal and state courts, the validity of a transfer of a chattel brought into a country by the consent of the owner is governed by its law; and that rule applies to negotiable instruments." That case involved a forged check. The check was drawn payable to the District of Columbia. The law of the District provided that forged indorsements in payee's name are wholly ineffectual and that the subsequent bona fide holder ordinarily, without notice, and for value, would not acquire title. The check was made payable to a resident of Yugoslavia and mailed to an address there. The law of Yugoslavia provided that the transferee in due course acquired title in due course despite the forgery of an indorsement. The indorsement was forged in Yugoslavia, and it was held that the law of

that country controlled. It may be stated as a general principle of law that no title is obtained through an act of forgery. The lunatic's contract is, in effect, no contract, if promptly and properly disaffirmed. The effect of the execution of a contract by an insane person is to be determined by the laws of the place of contracting as much as the result of the forging of an instrument is subject to the laws of the country where the forgery was committed.

In Farrior v. Hughes-Law Lumber Co., 113 Fla. 209, 151 So. 377, in an action brought to foreclose a mechanic's lien against the guardian of an incompetent, the plea of insanity was interposed as an answer. The court held that the pleading was bad in that there was no intimation of "fraud, deception, bad faith or undue influence." The contract was executed. There was no offer to place the plaintiff in status quo. The effect of this holding is that a contract by an insane person, if executed, is valid where the parties can not be placed in status quo and there is no fraud, deception, bad faith or undue influence. For the reasons assigned, it seems to me that the holding of the Supreme Court in Florida is a declaration of the law as regards the instant case and binding on this court. However, I do not think there is any conflict with the federal law as it is interpreted today.

This necessarily follows from the rule that contract is voidable. Many cases in the state courts support this conclusion. However, whether the plaintiff is a holder in due course is immaterial. It is, also, immaterial because of the facts found as hereinbefore stated.

█ The notes provide that the ones liable thereon shall pay the necessary expenses in the collection of the notes, including attorneys' fees. The undisputed evidence is that there has been paid to attorneys for services and for other disbursements $935.75. There has been a large amount of detail work done in connection with the attempt to collect on these two notes. However, aside from the services of the attorneys upon the trial of this action, I fail to see why any considerable charge is justified. In addition to $930.75 there seems to have been a deduction of a collecting agency of $253.48. The amount collected was $856.60. Credit of $603.12 is given in this suit. It, therefore, appears that the total expenses incurred and paid

to date amount to $1,184.23. There is testimony, given by two of the attorneys for the plaintiff, that the reasonable attorneys' fees for services in connection with the collection of these notes is $2,000. Just how much attorneys' fees are included in the $1,184.23 does not appear. It seems to me that an allowance for attorneys' services in the sum of $500 in addition to what already has been paid is a reasonable compensation.

I, therefore, find that the plaintiff is entitled to recover $8,567 with interest thereon at the rate of 8 per cent. per annum from November 19, 1926, together with interest at 8 per cent. per annum on unpaid interest, less $856.68 paid May 13, 1929; $1,184.23 on account of moneys expended in connection with the collection of said notes and the sum of $500 as a balance in full for attorneys' fees for services in connection with the collection of said notes.

Findings in accordance with this opinion may be prepared and submitted, and, when signed, shall be and be considered to be a part hereof.