CHRISTIAN v. WAIALUA AGR. CO. et al.*

WAIALUA AGR. CO. v. CHRISTIAN et al.

No. 8329.

Circuit Court of Appeals, Ninth Circuit.

Dec. 9, 1937.

*Rehearing denied 94 F.2d 806.

WILBUR, Circuit Judge, dissenting in part.

———◆———

Charles M. Hite, of Honolulu, T. H., and Sloss, Turner & Finney, M. C. Sloss, E. D. Turner, Jr., and Charles E. Finney, all of San Francisco, Cal. (Sloss, Turner & Finney, of San Francisco, Cal., of counsel), for appellant Christian.

Alfred L. Castle, of Honolulu, T. H., and Herman Phleger and Maurice E. Harrison, both of San Francisco, Cal. (Robertson, Castle & Anthony, of Honolulu, T. H., and Brobeck, Phleger & Harrison, of San Francisco, Cal., of counsel), for cross-appellant Waialua Agr. Co.

Before WILBUR, GARRECHT, and HANEY, Circuit Judges.

HANEY, Circuit Judge.

A guardian of Eliza R. P. Christian, hereinafter referred to as the ward, filed a petition in a court in the Territory of Hawaii, against Waialua Agricultural Company, Ltd., hereinafter referred to as the company, James L. Holt, and Annie Holt Kentwell. The petition prayed that a lease, an agreement, and a deed, all covering an interest in real property in the Territory, and all alleged .to have been made by the ward when incompetent, be set aside; that the company be compelled to reconvey the property and to account for the reasonable rental value thereof. The Supreme Court of the Territory, 31 Hawaii 817, granted part of the relief asked, and denied the rest. Both parties have appealed.

R. W. Holt, who married a native Hawaiian, died in 1862 leaving a will by the terms of which some 14,000 acres of land in Hawaii were left in trust; one-third of the income was to be paid to each of his three sons for life; and at the death of each son, one-third of such lands was to vest in fee in the heirs at law of the son who died. All three of the sons survived the testator and were named James R. Holt, John Dominis Holt, and Owen J. Holt.

James R. Holt was the father of two ·sons, one of whom is named James Lawrence Holt. John Dominis Holt, who married a native Hawaiian, was the father of two children, one of whom died in infancy, and the other of whom is appellant's ward, Eliza Holt Christian. The other son, Owen J. Holt, was the father of nine children, one of whom is Annie Holt Kentwell.

On June 10, 1891, Owen J. Holt died, and as a result of his death an undivided one twenty-seventh interest in fee simple in the lands vested in each of his nine children.

In 1893, James Lawrence Holt acquired the sole title to the expectancy of the one-third interest in the event that he survived his father. He also acquired prior to July, 1902, control of the life interest of his father, and of John Dominis Holt, his uncle, and the father of appellant's ward. Such control was held in the name of a trustee.

On March 17, 1905, a lease of the lands was made for a term of twenty-five years from April 1, 1905, to the company, by the administrator of the testator's estate, the owners of the vested interests, and by the owner of the life interest in two-thirds of the estate. The ward was named as a party of the third part, and covenanted that the company "shall peaceably and quietly hold and enjoy the use and possession of said demised premises, free from let or hindrance from any other person or persons having lawful claim or title to the same, or to any thereof." This document was signed and acknowledged by the ward.

On August 31, 1906, the ward and Annie Holt Kentwell entered into a contract wherein it was recited that the latter had supported the ward for many years last past; that the ward would be entitled to receive a part of the rents of the above-mentioned lease upon the death of the ward's father (John Dominis Holt); and that the parties had agreed that Annie Holt Kentwell would support the ward for the rest of her life. By that contract, the ward " * * * does hereby give, sell, assign, release, transfer and set over unto the said—Annie Holt Kentwell— * * * all her title and interest in and to any and all rents, issues and profits to which she may hereafter be entitled or which may be due and payable to her by, through or under the lease to the Waialua Agricultural Company, Limited * * * or by virtue of being the only child of John Dominis Holt, the elder, and devisee under the will of R. W. Holt, deceased, together with all and every her right to demand, receive, collect, and receipt for all such rents, issues and profits from whomsoever due during the term of the natural life of her [the ward] * * *" There was also a provision whereby Annie Holt Kentwell agreed to support the ward for the rest of the ward's life, and that the heirs of Annie Holt Kentwell should be entitled to perform the contract if the ward survived Annie Holt Kentwell. This contract was recorded on June 17, 1907, in Honolulu.

On May 2, 1910, a deed was made to James Lawrence Holt of an undivided one-third interest in the lands, subject to a deed of trust made by James Lawrence Holt to a trustee and subject to the lease hereinabove described. The deed was signed by a number of people, including the ward, her father (John Dominis Holt), and Annie Holt Kentwell.

On May 28, 1910, James Lawrence Holt and his trustee conveyed to one Castle, as trustee, an undivided two-thirds interest in the lands, which included the one-third which was conveyed by the above-mentioned deed. This conveyance was recorded on May 31, 1910. The deed signed by the ward, above mentioned, was recorded on June 23, 1910.

Castle, as trustee, on May 17, 1920, conveyed the undivided two-thirds interest to trustees of a real estate trust, the conveyance being recorded the following day. The trustees, on July 20, 1921, then conveyed the undivided two-thirds interest to the company, which conveyance was recorded on the same day.

The ward's father died on April 10, 1922, leaving the ward as his heir at law. In June, 1926, the ward was declared incompetent and Annie Holt Kentwell was appointed her guardian in England, where both parties were then residing. On February 1, 1927, a brother of the English guardian (George H. Holt, being, like his sister, one of the nine children of Owen J. Holt), was appointed guardian of the estate of the ward in Honolulu. He will hereafter be referred to as the guardian.

The guardian on May 9, 1928, filed a petition in the Circuit Court of the territory, alleging that the company's attorneys, one of whom was Castle hereinabove mentioned, induced James Lawrence Holt, who was in the confidence of Annie Holt Kentwell, who in turn completely influenced and controlled the ward, to endeavor to induce Annie Holt Kentwell to procure the ward's signature to the deed hereinabove mentioned. It was alleged that an agreement was entered into between James Lawrence Holt and Castle, as trustee for the company to that effect. Other allegations are that the negotiations were carried out; that the ward had always been, and was on the date the deed was executed by her, wholly incompetent mentally to execute a conveyance; that the conveyance purported to be for a consideration of $30,000 to the ward, but that in fact it was never received by the ward; and that the amount was "grossly, utterly, and wholly inadequate as consideration." The lease and contract, hereinabove mentioned, were not mentioned in the petition. The guardian prayed that the deed executed by

the ward be canceled, and that the company be required to account for the rental value of the undivided one-third interest, purported to have been conveyed, from April 10, 1922, the date of the death of the ward's father (John Dominis Holt).

James L. Holt appeared and admitted the petition.

Thereafter, and on March 5, 1929, the guardian filed an amended petition which contained substantially the same allegations as the petition but included an allegation of the existence of the lease hereinabove mentioned; that it was executed at a time when the ward was "as at all other times herein mentioned, wholly and utterly incompetent to bind herself by executing said document"; and that neither the ward nor anyone on her behalf received any consideration for the execution of the lease. There was also an allegation that notwithstanding the facts as alleged "relief in equity against said lease need not be and cannot be herein prayed for, respondent's sole claim of right to the said lands being now based upon the said deed of May 2, 1910." In accordance therewith there was no specific prayer for relief against the lease, but there was a general prayer that the court "grant such other and further relief as to the Court may seem just and equitable, to the end that complete justice and equity may be done in the premises * * *"

Appellant replaced the guardian by stipulation dated March 12, 1929.

After trial of the cause, and on May 11, 1929, the trial court wrote an exhaustive opinion, in which it was held that the deed of a mentally incompetent person was not void, but voidable and would be set aside only when the equities so required. The court found: (1) That the ward "has never been competent mentally to execute a conveyance of property," and that "she was not competent mentally to execute the conveyance of May 2, 1910"; (2) that such incompetency was known to Annie Holt Kentwell, her husband and Jame Lawrence Holt; (3) that "the evidence does not clearly show that the (company) knew of such mental incompetency." The court held that the equities required cancellation of the deed. It entered a decree canceling the deed executed by the ward, upon return to the company of $30,-000 and interest, and entered judgment in favor of the guardian for rentals less $30,000 and interest in the sum of $540,-806.07.

The company appealed from the decree to the Supreme Court of the territory. That court exhaustively considered the case and held that a deed of a mentally incompetent was voidable, if the incompetency had not been judicially declared prior to the execution of the deed, and if the parties dealing with the incompetent did not have actual notice of the incompetency. 31 Hawaii 817. After exhaustive consideration of the evidence, the Supreme Court found: "The overwhelming weight of the evidence requires us to find, and we do find, that on May 2, 1910, [the ward] was and at all times has been mentally incompetent to execute a deed or to understand its purpose or effect or to engage in any business transaction of consequence. * * * In short, we find that at the date of the deed she was a congenital imbecile." It did not expressly find whether or not the company had notice of the incompetence, but after indicating it did not, assumed that it did not. It held that the equities required cancellation of the deed upon payment of $30,000 and interest, but held that since the lease and contract were not in issue they were presumed to be valid, and therefore if valid the ward would not be entitled to any rent because she had assigned it away. It reversed that part of the decree granting judgment for rent, ordering that appellant be entitled to amend to bring the validity of the lease and contract into issue.

The company thereupon appealed to this court which dismissed the appeal on the ground that the decision of the Supreme Court, 31 Hawaii 817, "contemplated further proceedings in the lower court" and therefore the decision was not final. 9 Cir., 52 F.2d 847.

The petition was thereupon amended in the trial court. The second amended petition included allegations that "said lease from its inception was and at all times has been wholly and utterly inoperative, ineffective and of no binding force or effect, with respect to the rights or interests of this petitioner." There was also an allegation that the contract above mentioned was executed by the ward at a time when she "was wholly and utterly incompetent mentally to bind herself, as was then well known by said Annie Holt Kentwell"; that the contract was executed without consideration and that its pro-

visions were "in no sense beneficial as to" the ward; that the contract "was at all times wholly and completely void and of no effect, or binding force whatever"; and that Annie Holt Kentwell "has at no time claimed and now claims no rights by virtue of said" contract. The prayer asked cancellation of the deed, the lease, and the contract, and for an accounting for the rental value of the one-third interest in the land from April 10, 1922 with interest.

Both James L. Holt and Annie Holt Kentwell answered, admitting the petition.

Upon the trial, the trial court refused to permit the introduction of further evidence on the issue of incompetency of the ward because it construed the opinion and order of remand of the Supreme Court to specifically prevent the taking of such evidence. It entered a decree as prayed for, the judgment for rent being $606,785.75.

The company thereupon appealed again to the Supreme Court of the territory. Two members of that court, one being the Chief Justice, held that it (the Supreme Court) had erred in directing the trial court not to permit further evidence on the issue of incompetency, but that the error was harmless, because the ward received "valuable consideration, both for the lease and for the assignment, in the form of support and maintenance from Annie Kentwell"; and that both the lease and contract were for the ward's best interest and that they should not be canceled notwithstanding the ward's incompetency. One justice dissented.

The Supreme Court held that the ward had assigned the rents, issues, and profits by contract to Annie Holt Kentwell for life, and that the latter had conveyed that interest by deed to the company. A decree was entered by the territorial Supreme Court canceling the deed of the incompetent only. Appellant appeals from the portion of the decree adjudging the lease and contract to be valid, and denying appellant rents, and the company appeals from that portion of the decree canceling the deed.

■ With reference to the facts found, "when two courts have reached the same conclusion on a question of fact, their finding will not be disturbed unless it is clear that their conclusion was erroneous." Baker v. Schofield, 243 U.S. 114, 118, 37 S.Ct. 333, 334, 61 L.Ed. 626, and cases cited; Geddes v. Anaconda Mining Co., 254 U.S. 590, 600, 41 S.Ct. 209, 212, 65 L. Ed. 425; Texas & N. O. R. Co. v. Ry. & S. S. Clerks, 281 U.S. 548, 558, 50 S. Ct. 427, 429, 74 L.Ed. 1034, and cases cited.

■ If the questions of law before us are questions of general law, then we may exercise our own independent judgment in the decision thereof. Swift v. Tyson, 41 U.S., 16 Pet., 1, 17, 10 L.Ed. 865. On the other hand, if the questions presented are questions of local law, we are required, ordinarily, to sustain it by the great deference due the local tribunals, unless there is a sense of clear error committed. Matos v. Hermanos, 300 U.S. 429, 57 S.Ct. 529, 81 L.Ed. 728, and cases cited; Santa Fe Cent. Ry. Co. v. Friday, 232 U.S. 694, 700, 34 S.Ct. 468, 58 L.Ed. 802; Ker & Co. v. Couden, 223 U.S. 268, 279, 32 S.Ct. 284, 56 L.Ed. 432; Kinney v. Oahu Sugar Co., 9 Cir., 255 F. 732, 736, and cases cited; and see Ewa Plantation Co. v. Wilder, 9 Cir., 289 F. 664, 670.

■■ It is indicated in Edwards v. Davenport, C.C. Iowa, 20 F. 756, 762, that the questions presented are questions of general law. On the other hand, it is indicated in two cases that the questions presented are questions of local law. Safe Deposit & Trust Co. of Baltimore v. Tait, D.C.Md., 54 F.2d 383, 385; Kevan v. John Hancock Mut. Life Ins. Co., D.C.Mo., 3 F.Supp. 288, 390. We believe it is unnecessary to decide this question. The law declared by the Supreme Court in the second appeal is in conflict with that declared in the first appeal. If the questions presented are local, then we believe we must exercise our own independent judgment in our decision thereof, in view of the conflict, because the rule, by analogy applicable here, is that "where state decisions are in conflict or do not clearly establish what the local law is, the federal court may exercise an independent judgment and determine the law of the case." Edward Hines Yellow Pine Trustees v. Martin, 268 U.S. 458, 463, 45 S.Ct. 543, 545, 69 L.Ed. 1050, and cases cited.

Appellant seems to contend that a deed or contract of an incompetent is void, and that proof of incompetency alone entitles the incompetent to relief against such deed or contract. He relies on Dexter v. Hall, 82 U.S., 15 Wall., 9, 21 L.Ed. 73; Kendall v. Ewert, 259 U.S. 139, 148, 42 S.Ct. 444,

448,[1] 66 L.Ed. 862; Plaster v. Rigney, 8 Cir., 97 F. 12, 16; Sothern v. United States, D.C.Ark., 12 F.2d 936, 937; Edwards v. Davenport, C.C.Iowa, 20 F. 756; Farmers Bank & Trust Co. v. Public Service Co., D.C.Ky., 13 F.Supp. 548; Anglo-California Bank v. Ames, C.C.Neb., 27 F. 727; Parkhurst v. Hosford, C.C.Ore., 21 F. 827, 832; German Savings & Loan Soc. v. De Lashmutt, C.C.Ore., 67 F. 399; Clark Car Co. v. Clark, D.C.Pa., 11 F.2d 814; 2 Federal Law of Contracts 27, § 336.

On the other hand, the company contends that a deed or contract made by an incompetent is voidable only, and relies on Luhrs v. Hancock, 181 U.S. 567, 574, 21 S.Ct. 726, 45 L.Ed. 1005, and Beale v. Gibaud, D.C.N.Y., 15 F.Supp. 1020, 1027. See, also, Safe Deposit & Trust Co. v. Tait, D.C.Md., 54 F.2d 383, 385, and Kevan v. John Hancock Mut Life Ins. Co., D.C. Mo., 3 F.Supp. 288, 290, where local law is applied. In Levine v. Whitney, D.C.R. I., 9 F.Supp. 161, the question was mentioned but left undecided. ·

We hold that contracts made by an incompetent are void because an incompetent is incapable of giving the required assent thereto. Dexter v. Hall, supra, 15 Wall. 20, 21 L.Ed. 73; Gardner, "When and Under What Circumstances May an Insane Person Be Held Upon His Contracts?" 1894, 38 Cent.L.J. 224; Cook, "Mental Deficiency and the English Law of Contract," 1921, 21 Col.L.R. 424. Relief against such a contract should not be granted, however, on proof of incompetency only. Equity does not always grant relief against a void contract. For instance a gambling contract is void (6 R.C.L. 775, § 180), but the loser is granted no relief when he asks rescission and restitution of the property lost. 12 R.C.L. 761, § 64. The court in such instance looks, not at the fact that the contract is void, but at the status of the parties involved and refuses relief, because the loser is in pari delicto with the winner. So, in the case of a contract made by an incompetent, after proof of the incompetency, relief will be granted against the contract, or refused, depending upon the situation of the parties at the time relief is asked; in other words, the situation of the parties is the controlling factor.

This, we believe, is the true reasoning to be applied, and is illustrated by the following quotation from the discussion by Gardner cited above:

"* * * The very essence of a contract is the meeting of the minds of two contracting parties. In theory then, one absolutely insane, having no mind, cannot contract because of the impossibility of the meeting of the minds. * * *

"* * * If a person in good faith enters into a contract with one apparently sane, and whose actions would in no way tend to put a reasonably prudent man on his guard, and a valuable consideration has been paid, there being no undue advantage taken and no unfairness in the bargain, and the consideration cannot be restored by the insane person so as to place the other party in statu quo, then, whether the party be sane or insane, the contract will be good * * *

"Again assuming good faith, fairness and absence of fraud, the courts still hold that if the person contracting with the insane party can be placed in statu quo the contract will not stand. What does this mean? If a contract is valid, what does the accidental fact that a party can be placed in statu quo, have to do with it? If I buy a horse and the bargain is fair, the mere fact that I can return the horse does not give me the right to do so and rescind the sale. It would seem that there is something wrong with this executed contract, or the fact that one party can place the other in statu quo would not in any way alter its binding effect. The contract is not valid. It is not, then, because the executed contract is valid or binding, that it will not be set aside, but because an innocent party without fault or negligence would be prejudiced thereby. As between these two innocent parties, the law will not interpose to effect a wrong on either, but will suffer the misfortune to stand where nature put it. It is true, the courts have not always made this distinction, but have reached the same result on the inaccurate theory of the validity of executed contracts * * *"

Situations are presented where an incompetent asks a court of equity to give him relief as against some act he has done, but would not have done had he been competent. Even though the bargain may seem fair, the incompetent usually has special reasons in asking for relief. The courts should not be concerned with his reason, but, after proof of incompetency,

with the status of the parties, as shown hereinafter by the various factual situations. This, as will appear, does not mean that the court should balance all equities of the parties, as was done by the trial court.

■ Before considering the factual situations, we say, in regard to the company's contention, that a different rule should apply to the case of a deed made by an incompetent than to a contract made by him, that the principle is the same, and there is no 'distinction. 1 Williston on Contracts, Rev.Ed., 738, § 249.

■ One situation presented is where the incompetent makes a contract with one who either has knowledge of the incompetency, or who does not have such knowledge but is guilty of bad faith or overreaching. In such case, relief must be afforded, the consideration received by the incompetent need not be restored, and a third person dealing with the one who contracted with the incompetent is not protected. Kendall v. Ewert, supra.

In Kendall v. Ewert, supra, the incompetent was "overreached" by one who had knowledge of the incompetency (at page 147 of 259 U.S., 42 S.Ct. 444, 448, 66 L. Ed. 862). The lower court heretofore was, and the trial is in accord with this rule. Kailikea v. Hapa, 13 Hawaii 459.

The other situation is where the one dealing with the incompetent has no knowledge of the incompetency, and is not guilty of bad faith or overreaching. Brown in "Can the Insane Contract?" 1933, 11 Can. Bar Rev. 600, aptly describes the situation as follows: " * * * Here, for the first time, arises a real conflict of equities. One of two innocent parties must be saddled with liability. Which shall it be? On the one hand it is argued that 'if of two innocent parties one must suffer, surely the courts ought to favour that one who is least capable of guarding his own interests.' On the other hand, 'it is not to be presumed that ordinary business men are experts on insanity. In these days of commercial war, when the nervous tension is at the highest and sane men are driving mad bargains, it must be confessed that it is a harsh law that would hold the business world to know whether a man be sane or insane. Supposing now, that the man drives a good bargain and acts rationally, is the commercial world bound to know that he is insane, while at the same time

men acknowledged to be sane are making hazardous, if not insane bargains? This doctrine would be plainly disastrous to all the commercial world, and the Courts by mingling common sense with legal theory have warded off the evil results that must otherwise have followed * * *' * * *"

■ In this situation, no legal hardship results to anyone in granting relief against executory contracts. Accordingly, relief should always be granted. 32 C.J. 733, § 509.

With respect to executed contracts we find divergent views. A few cases do not regard the restoration of the status quo to the individual dealing with the incompetent, as of any moment, some on the theory that the contract is void, and some on the theory that the option to avoid the contract is exclusively the incompetent's. Neither of these views considers an innocent person in any different position than one who has knowledge or who is guilty of bad faith. Obviously equity should treat the parties differently. For this reason, we believe both of these views to be unsound. The innocent party dealing with the incompetent should receive more consideration than a guilty one. The cases supporting this conclusion may be found in 46 A. L.R. 416, annotation, supplemented in 95 A.L.R. 1442. Another view is that restoration to status quo is not material. If the party dealing with the incompetent dealt in good faith, without overreaching, and without notice, then relief is refused even though the status quo may be restored. This is the view in England (Brown, supra, 11 Can.Bar Rev. 600), and in a few states. 32 Col.L.R. 504, 506; 2 Black on Rescission and Cancellation, 2d Ed., 724, § 256. This view goes to the other extreme and protects one innocent party without enough consideration for the other, the incompetent. Even though the bargain might be fair, there may be special reasons for granting relief. It should be granted unless some sound reason forbids. This is the view taken by the court below on the second appeal with respect to the contract and lease.

■ The great majority of the courts, however, take the view in the case of the innocent party without knowledge, that relief will not be granted unless the parties can be placed in statu quo. 1 Williston on Contracts, Rev.Ed., 746, § 254; 3

612

Thompson on Real Property, 1006, § 2847; 2 Black on Rescission and Cancellation, 2d Ed., § 257; 46 A.L.R. 416, 95 A.L.R. 1442; 32 Col.L.R. 504, 506. That is an equitable rule, based on the reasoning that "as between these two innocent parties, the law will not interpose to effect a wrong on either, but will suffer the misfortune to stand where nature put it." The court below took this view on the first appeal in regard to the deed. We believe that the law thus declared in its first decision is correct.

The rule as stated means that if the parties can be placed in statu quo, the relief will be granted. 1 Williston on Contracts, Rev.Ed., 746, § 254; Gardner, supra, 38 Cent.L.J. 224, 226. It is no legal hardship on the party dealing with the incompetent if he receives back what he gave in the bargain.

The one exception to the rule is that relief will be granted if the incompetent received no benefit from the consideration regardless of his ability to restore the status quo. 46 A.L.R. 416, 95 A.L.R. 1442.

■ With respect to innocent grantees who take property received by an innocent person from an incompetent, the cases again split, some holding that relief should not be granted against the grantee, and others holding that the relief should be granted. 3 Thompson on Real Property, 1008, § 2848; 2 Black on Rescission and Cancellation, 2d Ed., 729, § 258; 32 Col.L.R. 504, 511. Since the party dealing with the incompetent, and his grantee, are equally innocent, it is difficult to see why any different rule should be applied as against the grantee, than is applied against the innocent person dealing with the incompetent. We recognize that the court below took this view by the effect of its holding on the first appeal[1] in regard to the deed, but the contrary view on the second appeal.[2] We believe its first decision was correct.

We apply these rules to the facts.

1. *Relief Against the Deed.*

With respect to the deed appellant contends that the ward was incompetent, and that the company had notice of such incompetency. The company denies these contentions, and in addition contends that it cannot be placed in statu quo, and that appellant is guilty of laches.

■ Both courts found that appellant was incompetent to execute the deed; that the company had no notice of the incompetency; that the company could be placed in statu quo; and that appellant was not guilty of laches. These conclusions were reached after careful consideration of the evidence. Exhaustive opinions were written considering the evidence. We accept them because we can not say there was clear error, since the evidence at most was only conflicting.

In accordance with the rules above stated, and considering the company as an innocent party without notice, relief was properly given, we believe, because the status quo of the company may be and was restored by the decree by setting off the $30,000 purchase price, which the compa-

---

[1] The deed was not made directly to the company, but to Holt, who conveyed to Castle, who conveyed to trustees, who conveyed to the company. The court below also quoted from 3 Thompson on Real Property, 1007–1009, § 2848, wherein it is stated: "The deed of an insane person not under guardianship may be avoided not only as against the grantee, but as against subsequent bona fide purchasers from the latter."

[2] The court below on the second appeal did not find whether or not Annie Holt Kentwell had knowledge of the ward's incompetency. It apparently declared the rule which would be applicable in either event, for it first held that "property passes to the innocent third person freed from the taint which it received by reason of the guilty knowledge of the first grantee or assignee." It also stated: "In view of the rule which we have already adopted in this case that, when the deed of an incompetent is to a person not having knowledge of the incompetency, requires that an innocent third person in the position above described should not be placed in a worse position than he would have been in if he had been an innocent, direct taker from the hands of the incompetent. When the W. A. Co. received the deed of Annie Kentwell, of May 2, 1910, it did so, as we have already held, without knowledge of the incompetency of Eliza. In our opinion the deed from Annie Kentwell, a competent person, to the W. A. Co., did operate transfer to the company the right which Annie had secured from Eliza by the assignment of 1906." Although, by this paragraph, it stated the correct rule, it in fact placed the company in a more favorable position, inasmuch as it did not consider the position of Annie Holt Kentwell, and protected the company.

ny paid, together with interest, against the accrued rentals to which the ward was entitled.

## 2. *Relief Against the Lease.*

■ As has hereinbefore been stated, on the first appeal the court below said that if the lease dated March 17, 1905 was valid, then the ward had assigned the rentals reserved by the contract of August 31, 1906, and therefore could not recover such rentals. It thereupon reversed the judgment of the trial court, and directed that the pleadings be amended so as to place in issue the validity of both instruments. Such action was proper. Crockett v. Lee, 20 U.S., 7 Wheat., 522, 5 L.Ed. 513; Combs v. Hodge, 62 U.S., 21 How., 397, 16 L. Ed. 115; Robertson v. Cease, 97 U.S., 7 Otto, 646, 24 L.Ed. 1057.

Appellant amended the petition alleging that the lease was void because (1) made by an incompetent to a lessee which had notice of the incompetency; (2) of a want of consideration. James L. Holt and Annie Holt Kentwell answered, admitting the ward's incompetence. The company answered, denying the incompetence and the want of consideration. It alleged that the lease was supported by consideration as follows: (1) The covenants and promises of the company in the lease; (2) the joinder in the execution thereof by other parties, thus assuring unified possession and control of the premises; (3) the company's promise to pay rent and taxes; and (4) the improvement of the premises inuring to the ward's benefit.

The trial court found, among other things: (1) The ward "was not an original party-lessor; she was merely a party assenting to continued possession by the Waialua Company for such balance of the term of the lease as might remain * * * if and when her interest * * * should vest"; (2) the company "has never paid (the ward) any consideration under said lease, or attempted to indicate what improvements were divisible at the termination of the lease, if the same were to stand"; (3) that its findings on the first trial included a finding that the ward "was at all times a congenital imbecile, incompetent to enter into a contract of such a character"; (4) that its findings on the first trial included a finding that the company, "in 1905, is not shown to have had any knowledge of this incompetency." The trial court concluded that the equities

required the granting of relief to appellant, and that, "Substantial adjustment of the status quo is possible under the facts."

With respect to the issue of consideration the court below said that the ward "did, however, receive valuable consideration, both for the lease and for the assignment, in the form of support and maintenance from Annie Kentwell and is entitled, under the assignment of 1906, to continue to receive that support and maintenance during the remainder of her life."

With respect to granting of the relief, the court below did not find, but assumed for the purpose of the decision, that the ward was incompetent at the time of the execution of the lease. It found that the company had no knowledge of the incompetency; that the consideration for the lease was adequate; that the bargain was fair and reasonable; that "there was no fraud, actual or constructive." It concluded: "Irrespective of the subject of status quo the lease of March, 1905, and the instrument of August 31, 1906, should be sustained."

■ With respect to the issue of want of consideration, we believe the court below was right in result, for a reason other than the one assigned by it. Neither the support nor the promise thereof came from the company, and was not the consideration for the ward's promise in the lease.

■ On the first appeal, the court below said: "* * * when the owner of a contingent remainder in land joins in a lease made by the life tenant and the lease contains a guaranty of possession during its term ·it is not terminated by the death of the life tenant nor does his death affect the obligation of the lessee to remain in possession of the premises during the remainder of the term." Inasmuch as that rule is one of property, and we cannot say it is clearly erroneous, we adopt it as the rule in the territory. See Lake Erie Gas, Coal & Coke Co. v. Patterson, 184 Pa. 364, 39 A. 68; Armstrong v. Rodemacher, 199 Iowa 928, 203 N.W. 23; Potomac Dredging Co. v. Smoot, 108 Md. 54, 69 A. 507; Matlack v. Kline, Mo.App., 190 S.W. 408, on appeal, 280 Mo. 139, 216 S. W. 323.

■ The effect of the rule quoted and the authorities cited, is that the remainderman is in the position of a lessor, because the remainderman's estate is be-

ing occupied by the lessee, inasmuch as the life estate terminated on the death of the life tenant. Therefore, here, the promises of the company to the lessors would also be to the ward, considering her as a lessor under the above rule. The promises of the company were the consideration for the ward's promise.

■ It must first be determined whether or not the ward was incompetent at the time the lease was executed by the ward. The trial court, on the second trial, said that a finding that the ward was a congenital imbecile meant that the ward was incompetent in 1905 when the lease was made. However, the findings heretofore made, were made with respect to the issue as to whether the ward was competent on May 2, 1910. A new determination should be made with respect to the issue as to whether the ward was competent on March 17, 1905, the date the lease was made.

### 3. Relief Against the Contract.

Appellant, after the case was remanded, alleged that the contract made by the ward and Annie Holt Kentwell was made when the ward was incompetent, and that Annie Holt Kentwell knew she was incompetent. The latter in her answer admitted the allegation. The trial court found that the finding on the first trial included a finding that the ward was incompetent at the time the contract was made and that "Annie Kentwell knew the facts as to her imbecility." The court below did not pass upon that issue.

■ With reference to the suggestion that the contract must be upheld as a contract for necessaries, we say that such a contract is never upheld on such ground. The ward is required to pay for the necessaries on the basis of a promise implied by the law—a quasi contract. The promise of the incompetent is not upheld, but she is liable on a quasi contract. 1 Williston on Contracts, Rev.Ed., 751, § 255; 2 Black on Rescission and Cancellation, 2d Ed., 724, § 256; Gardner, supra, 38 Cent. L.J. 224, 225; Cook, supra, 21 Col.L.R. 424, 436. However, such rule has no bearing in this case because Annie Holt Kentwell claims no benefit under the written contract, and has not asked for payment under the quasi contract, nor did she assign her right thereunder.

■ It must first be determined whether or not the ward was incompetent at the

time the contract was made. The trial court on the second trial held that the finding that the ward was a congenital imbecile on the first appeal was a finding that the ward was incompetent in 1906. For reasons explained in regard to the lease, there must be a new finding from the evidence with respect to the ward's incompetency in 1906.

■ In the event that the trial court finds that the ward was competent at the time the contract was executed, it becomes necessary to determine what was assigned by the ward in the contract. That determination, being merely an interpretation of the contract, is one of general law on which we may exercise our independent judgment.

Appellant contends that the ward transferred, (1) either the rents under the lease of 1905 only, or (2) all rents, issues, and profits which would arise from the land. The company contends that the ward assigned both the rents under the lease of 1905, and the rents which might be due under any future lease. The court below held in accordance with the company's contention.

In considering the language used, we may divide it into three clauses: the ward (1) "does hereby * * * transfer * * * all her title and interest in and to any and all rents, issues and profits to which she may hereafter be entitled or which may be due and payable to her by, through or under the lease to the Waialua Agricultural Company, Limited, dated the 17th day of March, 1905, and recorded in said Liber ——, Folio ——, or (2) by virtue of being the only child of John Dominis Holt, the elder, and devisee under the will of R. W. Holt, deceased, (3) together with all and every her right to demand, receive, collect and receipt for all such rents, issues and profits from whomsoever due during the term of the natural life of her, the said (ward)."

With respect to the first clause, it is clear that the ward assigned the rents to which she might be entitled under the lease to the company, and those which were due and payable to her by that lease.

The second clause indicates that the ward assigned, either (1) rents due under the lease to the company to which she might be entitled by virtue of being the only child of John Dominis Holt, and devisee under the will of R. W. Holt, de-

ceased, or (2) rents to which she might be entitled by virtue of being the only child of John Dominis Holt, and devisee under the will of R. W. Holt, deceased, which would mean that the ward assigned all rents including those to which she might be entitled under the lease to the company and any other lease.

It is a familiar rule of construction that the contract must be construed as a whole, and the intention of the parties determined from the entire document. 13 C. J. 525, § 486. We therefore refer to other language used in the instrument. In the recital, we find a statement that the ward "is entitled to a certain undivided interest or moiety in certain lands" because of the provision in the will of R. W. Holt, deceased, which lands are "now leased to the" company. This provision is followed by the following: "Whereas—by virtue of being such * * * devisee under the will of R. W. Holt, deceased, aforesaid, she * * * [the ward] shall upon the death of * * * John Dominis Holt * * * be entitled to her share of the rents reserved in said lease aforesaid * * *" No other rents are referred to anywhere in the recitals.

In Keelikolani v. Crown Land Commissioners, 6 Hawaii 446, 447, the following quotation from 2 Parsons on Contracts 7, was approved: "Where there are recitals of particular claims or considerations, followed by general words of release, the general words shall be restrained by the particular recital." In that case there was a conveyance of particularly described "Crown Lands" followed by general words conveying all "Crown Lands" to which the grantor might be entitled. The court there held the general words to be restricted by the specific words.

In the instant case, the apparent intention of the ward was to convey the rents due and payable to her by the specific terms of the lease, but recognizing that the lease did not mention her as one of the lessors, she describes how she might be entitled to rents under that lease, by saying that she was transferring such rents to which she might be entitled under the lease "by virtue of being the only child of John Dominis Holt, the elder, and devisee under the will of R. W. Holt, deceased." However, if we consider that the clause is ambiguous, then under the rule of construction above quoted, we must restrict the second clause, thus arriving at the same construction.

The third clause contains the language: "together with all and every her right to demand, receive, collect and receipt for all such rents, issues and profits from whomsoever due during the term of the natural life of her [the ward]." The company contends that this language means that the ward was making a second assignment of all rents which might become due under future leases. We believe this contention to be erroneous. It should be noted that the ward does not transfer her title, interest, or possession to such rents, but only "her right to demand, receive, collect and receipt for all such rents." Likewise, it should be noted that the word "rents" is qualified by the word "such." The words "such rents" refer to the rents previously mentioned, i. e. the rents under the lease to the company. If the ward had intended to include other rents, she would not have used the word "such." Apparently, then, the ward was transferring the rents to which she might be entitled under the lease to the company "together with all and every her right to demand, receive, collect and receipt for all such rents." The words "from whomsoever due" merely include the contingency that the company might assign the lease. The words "during the term of the natural life of" the ward, simply include the contingency that the ward might die before the lease expired.

If we assume, for the purposes of argument, that the third clause refers to rents other than those mentioned in the lease to the company, it seems clear that she did not assign her title and interest to such rents. The words "her title and interest," used in the first clause, are omitted in the third clause, making a sharp contrast between the respective clauses. The third clause is broad enough to make Annie Holt Kentwell a collection agent for the ward only, the latter reserving her title and interest thereto.

We believe the contract assigns to Annie Holt Kentwell only the rentals under the lease to the company to which the ward might be entitled. Under such construction it is unnecessary to pass on the appellant's contention that the contract was void if it conveyed a life estate in the rents, issues, and profits of the land, under a statute providing that "no sale

* * * of her [the wife's] real estate shall be valid without the written consent of her husband."

█ If the trial court should find that the ward was incompetent when she executed both the lease and contract, then relief against both the lease and the contract must be granted. Since the company paid no rent to the ward, there is nothing to be restored by the ward. Under such findings the ward would be entitled to reasonable rentals from April 10, 1922.

█ If the trial court should find that the ward was incompetent at the time when she executed the lease, and competent when she executed the contract, then relief should not be granted against either the lease or the contract, because execution of the contract would amount to ratification of the lease, by the ward, while competent.

Under such findings, the ward would be entitled to reasonable rentals from the date of expiration of the lease.

█ If the trial court should find that the ward was competent at the time the lease was executed and competent at the time the contract was executed, then relief against both the lease and contract should be denied and the ward is entitled to no rents until the date of expiration of the lease.

█ Finally, if the trial court should find that the ward was competent at the time the lease was executed, and incompetent at the time the contract was executed, then relief against the lease, should be denied, and relief against the contract should be granted, inasmuch as the status quo of the company has been restored by the decision with respect to the deed. Under such findings the ward would be entitled to the rent specified in the lease from April 10, 1922, to the date of expiration of the lease, and a reasonable rental thereafter.

4. *Improvements.*

Since April 1, 1905, to April 5, 1928, the time of the demand by the guardian on the company, the latter has expended $630,722.12 for improvements on the lands in question, of which, improvements in the sum of $93,460.95 have since been abandoned.

At the first trial, the trial court said nothing about improvements. On the first appeal, the court below said that under the broad powers vested in the courts in partition proceedings any rights of the company could be equitably settled if, as and when a suit for partition was brought. On the second trial, the trial court decreed to the company the right to continue in the exclusive use and occupation of improvements such as ditches, reservoirs, pipe lines, railroads, power and transmission lines, and camp sites. On the second appeal, the court below decreed that the ward convey certain lands upon which improvements existed, to the company absolutely, and permanent rights of way over other lands upon which existed other improvements; and that the company assure certain rights of way to the ward.

We believe neither the court below nor the trial court was correct.

█ The rule is that: "Where the vendor takes advantage of some disability, such as coverture, insanity or infancy to rescind the sale, the purchaser is entitled to an allowance for improvements made in good faith * * *." 66 C.J. 796, § 413. See, also, 32 C.J. 724, § 486.

In 31 C.J. 319, § 27, it is said:

"As a general rule in order that one may recover compensation for improvements made on another's land, even in a court of equity, it is necessary that he shall have made such improvements in good faith while in bona fide adverse possession of the land under color of title. There must be three concurrent essentials: (1) The occupant must have made the improvements in good faith; (2) he must have been in possession adversely to the title of the true owner; and (3) his possession must have been held under color or claim of title. * * *

" * * * It is also necessary that the improvements be permanent and beneficial to the owner of the land; and that they be retained by him."

█ If relief is not granted against the lease in the trial court, then the company is entitled to no allowance for improvements because by the terms of the lease, the improvements were to become the property of the lessors at the end of the term.

█ On the other hand, if relief against the lease is granted, then the company is entitled to an allowance for the improvements placed on the property after May 2, 1910. The allowance, however, is not based on the cost of the improvements, but on the enhanced value of the land caus-

ed solely by the improvements (66 C.J. 797, § 419; 31 C.J. 334, § 51), not exceeding the cost thereof. 31 C.J. 336, § 53; 66 C.J. 797, § 419.

Here, if the company is entitled to an allowance for improvements at all, it is entitled to an allowance of one-third of the enhanced value of the land, due solely to the addition of improvements since May 2, 1910. That amount may be made a lien against the land, or may be set-off against the rentals, if any, which are found due to the ward.

### 5. *The Evidence on Remand.*

At the first trial, one issue presented was the competency of the ward in 1910. On the second appeal the court below said: "At the original trial about 116 witnesses testified, pro and con, on this issue." There was evidence specifically directed to the ward's competency in 1905 and 1906. The court below discussed the evidence in relation to that period. At the conclusion of that evidence, the trial court found: "That Eliza R. P. Christian * * * has never been competent mentally to execute a conveyance of property." On appeal the court below said: "The overwhelming weight of the evidence requires us to find, and we do find, that on May 2, 1910, Eliza Christian was and at all times has . been mentally incompetent to execute a deed or to understand its purpose or effect or to engage in any business transaction of consequence * * *. In short, we find that at the date of the deed she was a congenital imbecile." The court below then remanded the case, directing the trial court not to admit further evidence against the ward's competency in 1905 and 1906. The trial court complied with the mandate, but on the second appeal the court below decided that it had erred in so restricting the evidence.

The company contends that it should be permitted to introduce further evidence. Ordinarily when a new issue is presented, such contention is correct. 4 C. J. 1242, § 3304. However, here we already have evidence, both pro and con on the issues. Any additional evidence would be merely cumulative. It is within the discretion of the trial court to admit or reject cumulative evidence. Sommer v. Carbon Hill Coal Co., 9 Cir., 107 F. 230, 232; International Paper Co. v. General Fire Assur. Co., 2 Cir., 263 F. 363, 365; Royal Exchange Assur. v. Graham & Morton Transp. Co., 7 Cir., 166 F. 32, 39; 64 C. J. 140, § 163.

Inasmuch as the case must ultimately be remanded to the trial court for decision upon the issue of incompetency of the ward in 1905 and 1906, the parties are entitled to present additional evidence upon those issues subject to the right of the trial court to limit the number of witnesses in the exercise of its discretion with respect to the admission of cumulative evidence. It must determine the issues with relation to the incompetency of the ward in 1905 and 1906 without regard to the previous finding on that subject by the trial court and by the court below.

Evidence regarding the increased value of the land due solely to the improvements placed on the land will, of necessity, be admitted.

The decree of the court below is reversed, and the cause is remanded to the Supreme Court of Hawaii with directions to remand the cause to the trial court with instructions to grant relief against the deed of May 2, 1910, as prayed for in the second amended petition, upon the payment to the company of $30,000 with interest at 6 per cent. from May 2, 1910, or by impressing a lien therefor upon the ward's interest in the land in question, and to take further proceedings in accordance with this opinion; and with further directions that if upon such further proceedings, in conformity with this opinion, any rentals are found to be due to the ward from the company, such $30,000 and interest aforesaid shall be set off against the amount of such rentals.

WILBUR, Circuit Judge (concurring in part, and dissenting in part).

I concur in that part of the opinion and order which requires the company to reconvey the property acquired by it through mesne conveyances from Eliza Christian upon the condition that the company be reimbursed for the sum of $30,000 paid for the property in the manner specified in the opinion. I concur in the reversal of the decree in so far as it affects the lease of March 17, 1905, and the agreement of August 31, 1906, upon the grounds stated in the opinion, except as hereinafter indicated.

I am not in entire accord with the order of the majority for reasons which I will presently state.

618

In my opinion the agreement of August 31, 1906, from Eliza Christian to Annie Kentwell, in consideration of her support and maintenance during the balance of her life, purported to convey not only all the rents accruing to Eliza Christian under the lease of 1905 after the contingent remainder of Eliza Christian became vested in 1922 upon the death of her father, as held by the majority opinion, but also all the rents, issues, and profits after the expiration of the lease and until her death.[1]

The lower court held that this agreement of August 31, 1906, transferred Eliza's right to the rents, issues, and profits of the land during her lifetime, but held that it should not be construed to convey an interest in the real estate because if so construed the agreement would be invalid under the law of Hawaii which requires a husband to consent in writing to a sale of real estate by the wife.[2] The main contention of the guardian is that the contract of 1906 purported to convey all the rents, issues, and profits of the property during the ward's life, and therefore it was in legal effect a conveyance of land and void under the statute because of a failure of the husband to consent in writing thereto.[3] The suggestion in the guardian's brief that the agreement of 1906 might be limited so as to cover the rents due under the lease of 1905 only is, I think, a mere makeweight added because of his misconstruction of the first opinion in this case by the lower court. The company contends that the agreement of 1906 conveyed the right to receive all the rents and profits of the property during the life of the ward. To meet the limitation of section 2993 of the Revised Laws of Hawaii (note 2), it argues that the agreement shows that it was not the intention

to transfer a life estate in real estate. The difficulty with this argument is that it is a fundamental principle of general application that the conveyance of income and profits of property operates to transfer the property itself. Green v. Biddle, 8 Wheat., 21 U.S., 1, 76, 5 L.Ed. 547; Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 580, 15 S.Ct. 673, 689, 39 L.Ed. 759; Wickizer v. Wickizer, 124 Kan. 818, 262 P. 589; Thompson on Real Property, vol. 1, § 715; vol. 3, p. 704, § 2569; 18 C.J. § 284, p. 306. Under this rule the effect of the conveyance of 1906 was to transfer an interest in real estate. The law requiring the husband to consent to such conveyance was intended to protect the wife and perhaps the husband also. There is no room for an interpretation of the instrument which would limit it to something less than an interest in real estate amounting in this case to a life estate. As the Supreme Court said in Pollock v. Farmers' Loan & Trust Co., supra, quoting from Coke's Littleton (page 45), "For what is the land but the profits thereof?" Therefore, the conveyance was invalid under the statutes of Hawaii, section 2993, Rev.Laws, 1925, supra. In view of the fact that my associates hold that the agreement of 1906 conveys the rents under the lease of 1905 only, I think it is unnecessary for me to point out the different results which would follow from the conclusion that the agreement is void.

With reference to the question of improvements I agree with the disposition of that question by the majority of the court with these exceptions: I think that after the company acquired title to the contingent remainder of the ward, all improvements made upon the property thereafter should be deemed to be made by reason of the possession and bona fide claim of

[1] The granting part of this instrument, which is set out in the majority opinion in full, omitting certain tautological expressions, is as follows: "Elizabeth R. P. Christian, in consideration of the premises and of one dollar * * * and for other and valuable consideration * * * does hereby * * * sell, assign, release * * * *all rents, issues and profits to which she may hereinafter be entitled* * * * through or under the lease to the Waialua Agricultural Company * * * or by virtue of being * * * a devisee under the will of R. W. Holt, deceased, together with * * * her right to * * * receive * * *

such rents * * * *from whomsoever due during the term of the natural life of the said Eliza R. P. Christian.*"

[2] "Sec. 2993. * * * provided, however, that no sale or mortgage of her real estate shall be valid without the written consent of her husband." Revised Laws of Hawaii 1925.

[3] In the guardian's brief he asserts: "The instrument of 1906 was void for want of written consent thereto of Eliza's husband," and asserts after argument on that point that "it is clear, we submit, that Eliza conveyed to Annie a life estate in the lands in question."

right thereto arising from the deed and also from its rights as cotenant in possession arising from its ownership of an undivided interest in the property derived from the other devisees of the original owner and should not be attributed solely to the right of possession given it by the lease, if valid, which by operation of law merged in the title conveyed by the voidable deed of 1910. In this connection it should be remembered that the right of the ward to the improvements made by the company as tenant while holding under the lease of 1905 arose because the improvements became a part of the land as soon as affixed thereto and that she immediately acquired a contingent interest therein which she conveyed in 1910 and which vested in 1922 in her grantee. The right of the company to the improvements it placed on the land resulted from the deed of 1910. The provision in the lease that the landlord should own the improvements placed on the land by the tenant was merely a recital of the legal effect of so doing, except, perhaps, as to what might be called trade betterments. Also, assuming that the lease of 1905 is invalid, the following disposition of the case should be made in regard to improvements placed on the property between 1905 and 1910: The improvements placed on the property between 1905 and 1910 were to belong to the landlord in 1930—the date of the expiration of the lease. Such improvements in effect operated as increased rental. By setting aside the lease the ward receives the benefit of the rental value after 1922 when her right became vested.

Any rent paid the landlord between 1922 and 1930 would, of course, be deducted from the value of the use of the premises allowed the ward. While no rent was actually paid the ward for that period, the improvements placed on the property before 1910 on the faith of the lease operated as compensation in part to the ward for the use of the leased property, and to that extent acted as rental for the period from 1922 to 1930. A decree canceling both the deed and lease should allow as a deduction from the value of the use and occupation of the property awarded the ward for her one-third interest in the property between 1922 and 1930 the pro rata value, that is eight twenty-fifths (eight years out of twenty-five) of the increased value of the property due to these improvements. The value of the use and occupation of the property should be determined without reference to the value of the improvements.

The next point to which I direct attention does not affect the result and is mentioned because I prefer to place my concurrence in that result upon the ground now to be stated. I have no doubt that the question of the results flowing from the incompetency of the ward are questions of general law. There is no statute of Hawaii upon the subject other than that adopting the common law (section 1, Rev. Laws of Hawaii 1935), and no rule of property on that subject. The lower court treated the question as one of general law, citing the decisions of a number of the state courts,[4] and both parties treat the matter as a question of general law in

---

4 The lower court in its first opinion, citing numerous decisions of the federal and state courts, quoted and adopted the rule stated in text books on general law: 32 C.J. 742, § 528; in Devlin on Deeds, § 73, and in 9 Am. & Eng. Enc. L., 2d Ed., p. 119; and in Story's Equity Jurisprudence, §§ 317, 318. It rejected the rule stated in 3 Thompson on Real Property, 1007–1009, § 2848, and in 2 Black on Rescission and Cancellation 718–720, § 254. The lower court stated:

"After much reading and careful thought, we believe the rule that the deed of a grantor who was mentally incompetent to execute it, but whose condition prior to its execution had not been judicially declared and which in contemplation of law was not otherwise known to those dealing with such incompetent, is voidable only in more strongly supported by reason and justice than the harsher rule that such deed is absolutely and unconditionally void. We also believe that it is in accordance with sound principles of equity and the highest standards of justice to say that such deed, when judicially attacked, should not be canceled upon the sole ground that the grantor was mentally incompetent but that in determining whether it should be canceled the nature of the transaction in all its aspects and the good or bad faith of those dealing with the grantor in respect to such transaction should be carefully considered. * * *

"When the grantee can be restored to the position it occupied immediately prior to the conveyance, the deed of the incompetent should be canceled even though it was taken in ignorance of the incompetency and even though the consideration paid was adequate."

their briefs, the only difference between them being that the guardian contends that there is a federal rule defining the general law upon the subject which should be followed as an authoritative interpretation of the general law.[5] There is no doubt that a decision of the Supreme Court of the United States upon the question of the rule of English common law on that subject as modified by American common law would control our decision thereon, but I believe that the correct rule of the English law so modified is stated in the main opinion approving the holding of the lower court as to the deed in which I concur and that there is no federal rule in conflict therewith.

With reference to the question of whether or not there was a consideration for the ward's joining in the lease of 1905, I think it is clear that the agreement to pay rental to the owners of the life estate was a sufficient consideration for the covenant for quiet possession by the owner of the contingent remainder. Ashburn v. Watson, 8 Ga.App. 566, 70 S.E. 19.

I concur in the order of reversal and order for a new trial, but dissent from those directions with relation to the decree to be entered upon such new trial in the respects indicated.

---

[5] The guardian states in his brief: "The questions involved in this appeal are, in substance, as follows:

"1. As between two rules of general jurisprudence, one prevailing in the courts of last resort of a majority of the states, and the other prevailing in the United States Supreme Court and a majority of the subordinate federal courts, which rule should be followed by the Supreme Court of Hawaii and the United States Circuit Court of Appeals for the Ninth Circuit in the determination of the issues presented in the instant case?"